**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

**v.**

**BANGOR PUNTA CORPORATION, Defendant.**

**No. 70 Civ. 3940.**

United States District Court,
S. D. New York.

Aug. 25, 1971.

Application Denied Sept. 17, 1971.

Philip A. Loomis, Jr., Gen. Counsel, David Ferber, Sol., Robert E. Kushner, Asst. Gen. Counsel, James J. Sexton, Atty., S.E.C., Washington, D.C., for plaintiff.

Webster, Sheffield, Fleischmann, Hitchcock & Brookfield, New York City, for defendant by James V. Ryan and C. Kenneth Shank, Jr., New York City, of counsel.

## FINDINGS AND OPINION

POLLACK, District Judge.

This is one of a series of cases in this Court arising out of a contest between Bangor Punta Corporation ("Bangor Punta") and Chris-Craft Industries, Inc. for control of Piper Aircraft Company ("Piper")—a struggle from which Bangor Punta emerged, in September, 1969, with control of Piper.[1]

In this action the Securities and Exchange Commission ("Commission") asks the Court to enjoin Bangor Punta from violating the Securities Act of 1933, 15 U.S.C. § 77a, et seq., (1971), and the Securities Exchange Act of 1934, 15 U.S.C. § 78a, et seq., (1971) and to order Bangor Punta to make an offer of rescission to holders of Piper stock who exchanged their shares for securities of Bangor Punta, pursuant to an exchange offer of July, 1969.

The Commission charges that Bangor Punta's registration statement and prospectus dated July 18, 1969 pertaining to the Piper exchange offer were materially deficient in failing to disclose an alleged decision to sell Bangor Punta's 98.7% stock interest in the Bangor and Aroostook Railroad ("BAR") at a price far below its carrying value on Bangor Punta's books and financial statements.[2] The Commission

1. In Chris-Craft v. Piper Aircraft Corporation, et al., S.D.N.Y., 69 Civ. 2227, Chris-Craft sues for damages alleging that Bangor Punta's victory was due to violations of the securities laws. Piper counterclaimed, and Bangor Punta sued Chris-Craft in a separate action, Bangor Punta Corp. v. Chris-Craft, S.D.N.Y., 69 Civ. 2354. The two actions were tried together.

2. As noted *infra* the sale of BAR stock took place October 2, 1969 and was for $5 million in cash, a figure some $13.5 million below the carrying value of BAR on Bangor Punta's financial statements.

further charges that Bangor Punta intentionally deferred the closing of that sale in order to avoid making and exposing the necessary write-downs until the exchange offer was completed.

Bangor Punta denies that the sale had been decided on in the June to August period that year or that there was then a reasonable probability of a sale. It contends that it was not required to make any reference in the prospectus of July 18, 1969 to the sale or to any steps leading to sale.[3]

The evidence adduced upon trial established the following facts.

On or about May 29, 1969, Bangor Punta filed with the Commission a registration statement and prospectus for an offering of its securities to holders of Piper common stock in exchange for their shares of Piper. The registration statement became effective on July 18, 1969 and the prospectus was sent thereafter to all Piper shareholders. On this offering, Bangor Punta obtained 111,628 shares of Piper Aircraft or about 7% of the 1,644,790 shares of Piper Aircraft common stock outstanding.

There is no information in the prospectus suggesting consideration or pendency of a sale of the BAR interest in June, July or August, 1969. Bangor Punta did sell its stock in BAR to Amoskeag Corporation ("Amoskeag") on October 2, 1969 at a price of $5 million in cash plus certain contingent payments described below.

The historic cost of BAR's assets, less depreciation and other accounting adjustments and less liabilities was about $29.8 million. However, the financial statements in the prospectus carry Bangor Punta's interest at $18.4 million, a figure which reflects an appraised value of the BAR shares as of September, 1965. The history of this figure is as follows.

Until 1961, BAR was an independent company. It then became a subsidiary of The Bangor and Aroostook Corporation (the "Corporation") which had been formed as a holding company. During 1960 and 1961 the Corporation offered its securities to BAR shareholders in exchange for their BAR shares and acquired more than 98% of BAR's outstanding shares. Based on the market price of BAR shares on the New York Stock Exchange before they were delisted in 1961, the Corporation's interest was worth $8.1 million and the Corporation carried the BAR interest at this figure in its financial statements.

In 1964, the Corporation combined with Bangor Punta (a wholly-owned subsidiary of Punta Allegre Sugar Corporation). Although Bangor Punta could have shown its equity in the net assets of the BAR at $29.8 million, it elected to carry forward the figure appearing on the books of the Corporation, viz., $8.1 million. It is claimed that this was done because of a strong possibility that BAR was to be disposed of promptly. By September, 1965, that possibility had evaporated. But, instead of restating the carrying value of BAR at the amount of Bangor Punta's equity interest in BAR on a historical cost basis (which would have resulted in a carrying figure of $29.8 million) or at its or its predecessor's cost, Bangor Punta obtained an appraisal from investment banking houses with knowledge of the railroad industry. Based on their recommendation as to approximate fair market value Bangor Punta restated the BAR holding at $18.4 million—approximately $10 million less than its equity in the underlying net asset value of the railroad on an historical cost basis and $10 million more than the former carrying figure. The difference between the former carrying figure of $8.1 million and the new appraised value

---

3. Bangor Punta has alleged as an affirmative defense that the administrative staff of the Commission, to overcome its own errors and shortcomings, has engaged in a course of conduct, whose intended result has been to interfere on be-
half of and to favor Chris Craft Corporation in its struggle with Bangor Punta for control of Piper, a struggle which has been going on since May, 1969. No proof was adduced to support this contention.

of $18.4 million was credited directly to Bangor Punta's earned surplus, by-passing the profit and loss account. This treatment had been the subject of inquiry by the Commission in connection with a prior registration statement and, after explanations were made, the Commission dropped the matter.

Except for minor accounting adjustments the $18.4 million carrying value of BAR established in 1965 remained unchanged and was reflected in the 1969 registration.

Bangor Punta's management had, for some time, sought a means of separating out BAR in a way which would permit its continued operation as a railroad. Discussions to that end were held within Bangor Punta in 1967 and 1968 and continued into 1969. Several methods were speculated on: viz., the creation of a New England Railroad System by combining the BAR with the Maine Central and Boston and Maine Railroads; an acquisition of the Delaware and Hudson Corporation and combination of its railroad with the BAR; a spin off of BAR or a rights offering to the Bangor Punta stockholders. Prior to April of 1969 there seemed to be no prospect of a buyer for the railroad.

On April 1, 1969, Bangor Punta appointed a committee to study the possible divestiture of BAR. The committee consisted of Curtis M. Hutchins, a director and member of the Executive Committee, Gordon Robertson, Co-Chairman of the Board and Chairman of the Executive Committee, Robert G. Stone and George H. Siel, Directors of the railroad. Messrs. Hutchins and Robertson were both past presidents of the railroad. This was a highly knowledgeable group on matters pertaining to the railroad and its problems.

Some weeks after the Committee was appointed Amoskeag Company through its president, Frederic C. Dumaine, made an offer to C. M. Hutchins to purchase the railroad for $5 million in cash.

Dumaine had long and active experience in the railroad business as an operator. Amoskeag was a registered investment company with investments in the Maine Central Railroad Company among other enterprises. Dumaine's price was merely the amount of the savings in operating expenses which he estimated could be effected if the Maine Central and BAR were combined.

Hutchins told Dumaine—in response to the latter's query—that Bangor Punta might dispose of its interest in the railroad if the price were right. As for Dumaine's offer of $5 million—for either the assets or the stock [4] Hutchins responded that this was exceedingly low but that he would convey the offer to the management. Essential details —including the railroad's cash flow figures, its balance sheet and a five year forecast, both cash and profit and loss—were furnished to Dumaine at a second meeting with Hutchins. Dumaine reaffirmed the $5 million offer as his highest price. Hutchins explained that he had no authority except to explore possibilities of divestiture of the railroad; he had no power of decision.

Hutchins and the Committee members with whom he conferred concluded that sale of BAR stock to Amoskeag at the proffered price of $5 million was the "best course for Bangor Punta to pursue."

The company's independent auditors were asked about the accounting treatment which would be afforded a sale of the railroad for $5 million. On May 20, 1969, they reported that such a sale would be treated on the financial statements of Bangor Punta as an extraordinary loss of about $13.5 million.

On May 21, 1969, at a meeting of Bangor Punta's Board of Directors, Hutchins, speaking for all the members of his Committee, stated that there were three possibilities for the future of BAR. Bangor Punta might (1) keep the railroad in its present status, (2) continue to

---

4. Dumaine's offer soon narrowed to one for the stock only and remained such through the negotiations.

seek to merge it with another railroad, or (3) sell BAR at the best possible price. He discussed each of these possibilities. In respect of the third possibility, he stated that the only person he knew who might be interested in a purchase was Dumaine, of Amoskeag. He reported that preliminary discussions with Dumaine indicated that he might be willing to pay $5 million in cash, securities or some combination of both.

Hutchins told the Board that his Committee unanimously recommended sale at the $5 million price. He reported that over the next five years a heavy infusion of capital in the order of $5 million would be needed to break even from operations. He gave very little hope for the possibility of a merger, except conceivably with the Boston and Maine Railroad, and noted that this would produce securities rather than cash for Bangor Punta. This proposal of sale was a surprise to the Board and met with the objection that the Board had insufficient information to make an intelligent decision since a great deal of accounting, tax and legal work had to be done as a preliminary matter to put the offer in proper focus.

In the course of the meeting, counter-suggestions as to price to be sought were broached by the Chairman of the Board, Nicholas M. Salgo.

Following discussion, it was the consensus of the Board that Hutchins should attempt to negotiate for a sale, at book value, of 51% of the stock of BAR and sale of the balance at a higher price, with the total consideration to approximate $7 million. Hutchins was separately authorized to negotiate a sale of 100% of the BAR stock, subject to an investigation of the tax and accounting ramifications of such a transaction and subject to the approval of the Board of Directors or of the Executive Committee of the Board of Directors.

Dumaine, informed by Hutchins of the Board's counter-suggestions, would not change his offer. Dumaine and Hutchins then drafted an unsigned letter setting forth a proposed arrangement of sale which Hutchins was to present to the Board. The draft, reciting that Hutchins was authorized only to explore the situation tentatively and that any "understanding" was subject to approval by the Board of Directors,[5] stated that Hutchins and Dumaine had agreed on the sale to Amoskeag of all the BAR stock owned by Bangor Punta for $5 million plus some additions, subject to ICC approval.

Shortly thereafter, on June 3, 1969, following Hutchins' report to a key management group of Bangor Punta, it was decided to table the entire matter until the tax impact upon Bangor Punta of a sale of assets, as compared with some other disposition of the interest, could be studied and ascertained.[6] Nothing indicated that there was any especial urgency for earlier consideration of the matter. While the divestiture of this asset was a matter of significant interest to Bangor Punta, time was not made of the essence, by either Bangor Punta or Amoskeag.

Two weeks later, on June 16th, Hutchins met with Dumaine and apprised him of the management's decision not to approve or accept the unsigned draft letter. He told him that Bangor Punta lawyers and accountants had no time available then to make the investigations and reports deemed essential by the Board; that they were busy with a variety of other matters, including a pending SEC registration statement (the Piper exchange offer); and that it might be two months before they could get to the in-

---

5. Hutchins explicitly informed Dumaine that time was needed for accountants and tax personnel of Bangor Punta to review the tax effects of any deal and the evidence unquestionably confirms Hutchins' limited exploratory role.

6. The study would require considerable time since it involved going to the Interstate Commerce Commission, sending representatives to Maine and going back over some 70 years of financial history and records and books of the BAR—a time consuming and complex project.

vestigation of the factors material to Bangor Punta's consideration of a sale.

Bangor Punta's general exchange offer for the common stock of Piper Aircraft expired at 5 P.M. on July 29, 1969 and was approved by Bangor Punta's shareholders on August 7, 1969. On August 8, 1969, Bangor Punta commenced distributing its securities to Piper shareholders who had accepted the exchange offer. The final prospectus for the offer stated:

> Until August 27, 1969, all dealers effecting transactions in the registered securities, whether or not participating in this distribution, may be required to deliver a Prospectus.

In the latter part of August, 1969, with the exchange program well nigh completed, Hutchins approached the general counsel of Bangor Punta with the suggestion that the required studies in respect to a sale of BAR go forward. Following instructions from the president, counsel began to gather the information which the Board of Directors was seeking.[7]

On September 9, 1969, Bangor Punta's Board of Directors continued their discussions regarding the sale of BAR, which according to the minutes "has been under consideration by the Board of Directors for a considerable period of time". Various proposals concerning the sale of the railroad were discussed, including an asset sale, a combination of a partial sale of the assets and a leasing arrangement of the remaining assets, and the sale of the stock of the railroad.

The Directors voted at that meeting to authorize Hutchins to consummate the sale of either the assets or stock of BAR to Amoskeag or to any other buyer for a consideration of $5 million or more in cash and such other additional consideration and benefits as were in his judg-

ment obtainable. The Board authorized the execution of documents and the taking of all other action necessary to consummate a sale in accordance with the terms and conditions so to be negotiated.

Six days later, on September 15, Hutchins wrote to Dumaine that Bangor Punta had not yet reached a decision as to whether it would be most advantageous to dispose of its interest in the BAR through a sale of the stock ownership or in the form of an assets sale. Hutchins proposed to Dumaine that an agreement be worked out which would allow Bangor Punta, at its option, to sell either the BAR stock or assets.

On October 2, Hutchins and Robertson met with Dumaine in Boston. Dumaine refused to change his position in respect of an assets transaction. Thereupon, a contract for the sale of the stock of BAR to Amoskeag was prepared and signed and the closing followed immediately thereafter.

The agreement of sale called for payment of $5 million in cash and other consideration. It was agreed that, if within three years BAR should transfer all of its assets except in a transaction in which neither gain nor loss is recognized for federal income tax purposes, Amoskeag would pay Bangor Punta an additional $1.5 million within 30 days after such transfer sale or other disposition.[8] And, subject to specified conditions, Amoskeag agreed that it would also pay the net profits received by BAR within the next five years from sale of all or any part of its property at Sears Island, Maine.

The public announcement of the BAR sale on October 3, 1969, expressly stated that the sale would result in a non-recurring book loss of approximately $13 million with no tax benefit to the company and that part of the $5 million to

---

7. The president was, however, careful to caution counsel not to allow the inquiry to interfere with any pressing current matters.

8. The purpose of this provision is not entirely clear. It may have been intended to act as a deterrent to Amoskeag to consider any course but continuance of operation of the road.

be received in cash for the stock would be subject to capital gains taxes.

*Major Factual Contentions and Conclusions*

■ It is contended by the Commission—and Dumaine gave testimony supporting the notion—that, at some undefined time during June, July or August, Bangor Punta had decided upon the sale to Amoskeag but decided to defer it to avoid disclosure in the pending registration statement and prospectus. These contentions, as well as Dumaine's testimony on the subject, lack support both in the credible evidence and in the probabilities. Indeed the evidence which the Court accepts as worthy of belief unequivocally negates any such purpose or plan.

The Commission's reliance on Dumaine's testimony is misplaced and the inferences which it has sought to draw that a sale was determined upon and deliberately deferred to avoid disclosure, are not accepted.[9]

The Bangor Punta Board's behavior was consistent with the dictates of prudence. It insisted on consideration and study of alternatives. It accepted the sale only after being convinced that no viable alternatives existed. If there was a conscious tactical motive in delay, the most believable one is that the Board hoped to let Dumaine (and indeed Hutchins, whose personal commitment to the sale was obvious) simmer long enough to come up with something better. Indeed, even after the Board meeting of September 9, information was being supplied to the Board and, on September 29, some of the Board members attempted to block a sale of stock and bring about a sale of assets. Their reasons were weighty—

for a sale of assets might permit the reflection of a tax loss as high as $17.7 million, producing an additional $9 million of cash flow for Bangor Punta—as distinguished from the taxability of proceeds from sale of stock.

Thus, while the Court finds that there was an intention to sell, failing other alternatives and upon the best available tax and accounting bases, the Court does not find that Bangor Punta consciously concealed, deferred or refrained from going forward with Dumaine's offer in order to circumvent disclosure in a pending registration statement.

*Requirements of Disclosure*

Bangor Punta could not in its registration statement and prospectus for the exchange offer omit "to state [any] material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q (a); Section 10(b) of the Securities Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 CFR 240.10b–5.

Bangor Punta's registration statement became effective on July 18, 1969. It "spoke" as of that date. The duty of dealers to use prospectuses continued until August 27, 1969.[10] The Commission insists that as of these dates Bangor Punta intended to sell and there was a reasonable probability that it would sell BAR at a substantial loss. Its failure to reflect this state of affairs is claimed to constitute the violations charged.

The Court has found that as of these dates Bangor Punta had not reached a decision to sell. The Commission's charge that the sale was a reasonable probability is made from the vantage

---

9. From observation during the trial the Court concludes that both Dumaine and Hutchins, who negotiated and desired the sale, believed what they wished to believe, namely, that their personal agreement concluded all but the formalities.

10. The effect of the antifraud provisions of the Securities Act (§ 17(a)) and of the Exchange Act (§ 10(b) and Rule

10b–5) is to require the prospectus to reflect any post-effective changes necessary to keep the prospectus from being misleading in any material respect. This is sometimes handled mechanically by putting a sticker on the prospectus or supplementing it otherwise. The procedure to be used is set forth in 17 CFR 230.424 (c).

point of hindsight. In the total perspective of events preceding the sale—including the last-minute attempts to convert it into a sale of assets—the Court cannot find that the sale was a reasonable probability at the time and to the people involved. *Cf.* James Blackstone Mem. Library Ass'n v. Gulf, Mobile and Ohio R. Co., 264 F.2d 445 (7th Cir.), *cert. denied,* 361 U.S. 815, 80 .S.Ct. 56, 4 L.Ed.2d 62 (1959). However, this does not necessarily mean that Bangor Punta met the obligation imposed upon it to make a requisite disclosure under the circumstances of this case. For the circumstances do indicate a sufficiently serious consideration of the possibility of sale at a figure some $13 million below the then carrying value of the BAR stock on Bangor Punta's books to force the conclusion that the Bangor Punta directors could not, at the time, have believed that the $18.4 million figure (based on an appraisal of 1965 fair market value) any longer represented a responsible appraisal of market value of the BAR holding.

In this respect, however, the Commission *is claiming more than it needs to.* The essential question is whether, despite the non-existence of intent or of reasonable probability, the circumstances surrounding the sale were such as to indicate that the $18.4 million carrying figure of the BAR holding was obsolete to the point of being misleading. The Court finds that it was—absent full disclosure of the factors affecting the ultimate decision to sell the BAR interest at a figure of $5 million—or even $7 million—and regardless of whether the sale was to be of stock or of assets.

The Court is aware of no principle of accounting or of fair disclosure which would justify a failure to up-date a constructed carrying figure which may have reflected approximate fair value in 1965 but which was almost four times the offer of a willing buyer (and the only willing buyer) in 1969, an offer which the Board—despite its efforts in good faith to find alternatives—was constrained ultimately to accept. Consistency of fair disclosure required exposure of circumstances which so clearly rendered obsolete an appraisal made four years earlier.

I find that Bangor Punta did not intentionally or purposefully mislead Piper Aircraft stockholders or the investing public by the omission to make disclosure of the sale under consideration nor did Bangor Punta or its directors intend to gain an advantage over Chris-Craft by the nondisclosure in the contest being waged for control of Piper. There was no purposeful connection between the nondisclosure and the contest for control. In other words, the nondisclosure was not prompted by an improper purpose. However, absence of bad faith does not excuse the failure to include facts necessary to render the statements in the registration statement and prospectus not misleading.

The explanatory footnote which did appear on the 1969 balance sheet was given so that anybody looking at the financial statements would not be confused as to why the full equity of the railroad was not picked up by Bangor Punta as the carrying value of its investment. By the same token, the 1965 "constructed" carrying value should not have been used when it was known to exceed substantially the only bid that could be generated from a purchaser capable and willing to buy and operate the asset.

*Bearing on Exchanging Piper Holders*

The standard of materiality to be applied here is whether a reasonable stockholder of Piper might have hesitated to make an exchange for Bangor Punta securities with such a large loss figure emerging—at least until sufficiently explained and put in proper perspective, in terms understandable by a reasonable investor.

At the end of fiscal 1968, Bangor Punta had retained earnings of $37.9 million. A sale of the stock at $5 million would result in a book loss equivalent to 36.5% of such retained earnings.

At the end of fiscal 1968, the shareholders' book equity in Bangor Punta

was $113.5 million and a sale of the BAR at $5 million would result in a loss of 12% of the shareholders' book equity.

Bangor Punta had reported profits for each of the five years ending with that of September 30, 1968. A sale such as was being investigated would involve a loss ($4.32 per share) which would have far exceeded the company's net income for any of the five prior years.

The Court concludes that the registration statement and prospectus of Bangor Punta relating to the Piper exchange offer was misleading in its failure to disclose the circumstances surrounding the negotiations for sale of the BAR interest. In so holding especial note is taken of the unique "valuation" nature of the $18.4 million figure at which the BAR interest was carried on Bangor Punta's books. The present conclusion is not necessarily to be taken as applicable in cases where book carrying figures are in accordance with principles of conventional transactional accounting or where circumstances might otherwise differ from those here.

*Relief to be Granted*

The Commission has requested an order requiring Bangor Punta to offer rescission to shareholders who accepted the Bangor Punta exchange offer and an order enjoining Bangor Punta from further violations of the securities laws. The Court grants the first and denies the second of these requests.

■ Bangor Punta claims that such an offer of rescission would be an empty exercise since the Bangor Punta securities received by the Piper shareholders have a market value far in excess of the Piper shares given up by them. See Electronic Specialty Co. v. International Controls Corp., 409 F.2d 937, 947 (2d Cir. 1969). The decision whether to rescind is nonetheless one to be made by those who took the exchange.

Accordingly, Bangor Punta will be required to make an offer of rescission and the parties are directed to submit an appropriate decree for the Court's

consideration to carry out such an offer. Such offer should allow Bangor Punta full scope to point out any factual considerations bearing on a decision to accept or by-pass rescission as may be accurate and appropriate under the circumstances.

Bangor Punta claims that an injunction is unnecessary and inappropriate since there is no evidence of its bad faith; that it acted on advice of counsel and of its accountants; and that this was an isolated transaction involving a single unintentional violation. Securities and Exchange Commission v. Torr, 87 F.2d 446 (2d Cir. 1937). Moreover, Bangor Punta contends that its past conduct does not indicate a reasonable likelihood of future violations. Securities and Exchange Commission v. Franklin Atlas Corp., 171 F.Supp. 711 (S.D.N.Y. 1959) (Dawson, J.); Securities and Exchange Commission v. Texas Gulf Sulphur Co., 446 F.2d 1301 (2d Cir. June 10, 1971).

The Commission insists that Bangor Punta has demonstrated a propensity for violating the securities laws because the company allegedly violated a consent decree entered on May 26, 1969 by the United States District Court for the District of Columbia in the Commission's suit there against Bangor Punta, by filing a registration statement which omitted to disclose the facts discussed in this opinion. That suit centered on a Bangor Punta-Piper release of May 8, 1969. Bangor Punta consented to the decree. The Commission's complaint here avers that the company's demonstrated propensity for violating the securities laws is not based upon the issuance of that release (which is a subject of controversy in an action by Chris-Craft against Bangor Punta and others). Chris-Craft Industries, Inc. v. Bangor Punta Corp., 426 F.2d 569, 573–576 (2d Cir. 1970) and 69 Civ. 2227 and 2354, n. 1 *supra*, now before this Court for decision.

■ Under all the facts and circumstances in this case, the Commission has

failed to carry its burden to establish, with persuasive evidence, that Bangor Punta, its officers, directors and employees have a propensity or natural inclination to violate the securities law. Securities and Exchange Commission v. Texas Gulf Sulphur Co., 446 F.2d 1301 (2d Cir. June 10, 1971). Accordingly, the requested injunction is denied.

The foregoing shall constitute the findings and conclusions required by F.R.Civ.P. 52(a).

Submit decree in accordance with these findings on 15 days notice.

So ordered.

On Application to Reopen Record.

Bangor Punta requested the Court to reopen the record and to make additional findings of fact. Subsequent to receiving the SEC's opposition to the request, Bangor Punta withdrew the application to reopen the record as unnecessary and has substituted a request that the Court issue a statement in disposing of this matter that generally accepted accounting principles were not litigated herein. The request and opposing paper are being filed herewith.

It is beyond the scope and intent of the opinion of August 25, 1971 to consider or decide what constitute accepted principles of accounting in the abstract. The opinion deals solely with the requirements of a prospectus used on an exchange of securities and with what is to be considered misleading in connection therewith. Any differences between accepted principles of accounting and fair disclosure in a prospectus must be resolved in favor of the disclosure requirements of the securities laws which ultimately are a management not an accountant's responsibility.

The application to reopen the record and for additional findings is accordingly denied.

So ordered.