657 F.Supp. 1122 (1987)
SECURITIES AND EXCHANGE COMMISSION, Plaintiff,
v.
Mason BENSON, et al., Defendants.
No. 84 Civ. 2263 (PNL).
United States District Court, S.D. New York.
April 8, 1987.
*1123 *1124 Linda B. Bridgman, John Courtade, S.E.C., Washington, D.C. (Anne C. Flannery, S.E.C., New York City, of counsel), for plaintiff.
Hoffinger Friedland Dobrish Bernfeld & Hasen, New York City (Jack S. Hoffinger, David B. Bernfeld, Mark W. Geisler, of counsel), for defendant Mason Benson.

OPINION AND ORDER
LEVAL, District Judge.
Plaintiff, the Securities and Exchange Commission ("SEC") moves for summary judgment against defendant Mason Benson, president and chief executive officer of Empire of Carolina, Inc. ("Empire") on a showing that from 1977 to 1982 he engaged in a fraudulent scheme to divert over $502,201.99 from Empire in violation of numerous provisions of the Federal securities laws.[1] Plaintiff seeks disgorgement in the *1125 amount of $502,201.99, as well as a permanent injunction against further violations of the federal securities laws. On the motion for summary judgment, the SEC has fully proved its contentions. Summary judgment is therefore granted in favor of the plaintiff. Defendant is permanently enjoined from further violations of the Federal securities laws and is ordered to disgorge the diverted funds.

Background and Contentions
From September 1972 to September 1978 Benson had been executive vice-president of Carolina Enterprises, Inc. (Empire's predecessor and now wholly owned subsidiary), at which time he became president and chief operating officer. In December 1979, Empire purchased Carolina. Benson then became Empire's president and chief executive officer. He resigned in March 1982. (The two companies are collectively referred to as "Empire.")[2]
During the periods in question Empire was a public company which primarily manufactured and marketed children's toys. Its common stock was listed and traded on the American Stock Exchange. To market its toy line Empire employed numerous outside sales representatives as well as numerous in-house sales people.
The complaint alleges that from at least 1977 to 1982, Benson violated the Federal securities laws in connection with a four-part scheme to misappropriate corporate funds from Empire. The scheme involved (1) requiring Empire's outside sales representatives to pay back a portion of their commissions to Benson or his designee; (2) requiring certain salaried employees to submit expense claims for fictitious travel and entertainment expenses to Empire and to remit the proceeds to Benson or his designee; (3) misappropriating refunds on unused airlines tickets purchased by Empire's employees by causing Empire's travel agent to issue the refund checks to Benson's designee and (4) paying a sales representative fictitious unearned commissions for transmission to Benson.
The complaint alleges that in furtherance of this scheme, Benson made false and misleading statements and material omissions of fact to Empire's investors and auditors and to the SEC in violation of numerous provisions of the Securities Act of 1933 and the Securities Exchange Act of 1934. Some of the documents alleged to have been fraudulently prepared in violation of these laws include Empire's securities registration statement for its initial public offering of common stock in December 1979, its November 1981 registration statement for its public offering of convertible subordinated debentures, numerous quarterly 10-Q reports, annual 10-K reports, proxy solicitation materials and several management representation letters to Empire's auditor Main Hurdman.
The evidence the SEC has presented in support of its motion is substantial and persuasive. It includes the testimony from over a dozen witnesses with first-hand knowledge of the scheme, plus supporting documentation consisting of checks and records identified and explained by numerous sales representatives and employees who participated in the scheme. The evidence shows a four-part scheme, carried out as follows:

Part I  Paybacks From Outside Sales Representatives
The most lucrative part of the scheme for Benson involved kickbacks to Benson of over $404,215 out of the sales commissions paid by Empire. Extensive testimony and documentation shows that Benson directed many of Empire's outside sales representatives who were compensated on a commission basis to return part of their monthly gross commissions (generally 20-30%) to *1126 Benson or certain designated entities for his benefit. The evidence shows that Benson's designees (Spartan Consulting Services, Inc., N.J.C. Consultants, Polo Management, Mollen Sales Corp. and others) were used as conduits to help divert the funds. The testimony of the sales representatives shows that they would cash the checks payable to them and deliver kickback cash to Benson. It was their understanding that the paybacks were a condition of their continuing business with Empire. See R. Blanken testimony, Ex. 4, pp. 122-124, 126, 145-148; Witkin testimony, Ex. 14, pp. 46-51, 54-65, 71, 84; Horchler declaration, Ex. 8, ¶ 3; Eckstein testimony, Ex. 9, pp. 65, 67, 71, 81, 102.
The scheme varied slightly for various sales representatives. The principals of three of the sales representative firms, Mollen Sales Corporation, Miller-Sperber Inc., and Harvey Prince Associates, testified that they were directed by Benson to give their monthly paybacks (payable to Benson or his designee) directly to Benson, either by cash or check. See Zaretsky dep. (principal of Mollen Sales Corp.) Ex. 2, pp. 14-15, 18-19, 25, 67-72, 74, 79, 134, 139; Ex. 3, pp. 15-16, 19-21, 25-26; Miller (principal of Miller-Sperber Inc.), Ex. 6, pp. 52-56, 71; Prince declaration (principal of Harvey Prince Associates), Ex. 7, ¶¶ 3-5.
Three other sales representatives, Blanken Sales Company, Inc., L.S.H. Sales, and Landsman & Eckstein made their paybacks to Benson or his designee through Empire's vice-president for sales Robert Witkin. R. Blanken testimony, Ex. 4, pp. 11-13, 117-124; Witkin testimony, Ex. 14, pp. 46-51, 58-64; Horchler declaration, Ex. 8, ¶ 3; Eckstein testimony, Ex. 9, ¶¶ 65-68.
Witkin and numerous participating sales representatives testified that Benson told them that Witkin collected the checks for him and that Benson decided the amount of the checks and to whom they were payable. See Blanken testimony, ex. 4, pp. 122-124, 126, 145-148; Witkin ex. 14, pp. 46-51, 54-65, 71, 84; Horchler declaration, ex. 8, ¶ 3; Eckstein testimony, ex. 9, pp. 65, 67, 71, 81, 102.
The supporting evidence of Benson's use of conduits to collect these paybacks is detailed and extensive. A few examples follow.
One of the designees to whom Benson frequently directed the sales representatives to make their payback checks payable, was Spartan Consulting Services, Inc. The SEC's evidence shows that Benson controlled Spartan and endorsed checks made payable to it. See e.g. Miller testimony, Ex. 6, pp. 44-46; Witkin testimony, Ex. 14, pp. 77-78; Ex. 14A. Numerous sales representatives testified that in directing them to make payback checks to Spartan, Benson represented that he controlled and had organized Spartan. See, e.g., Miller testimony, Ex. 6, pp. 44-46; Prince declaration, Ex. 7, ¶ 3. Moreover, Witkin not only testified that Benson had told him that he had founded Spartan, but that for almost two years part of his salary from Empire consisted of monthly checks from Spartan. Witkin testimony, Ex. 14B, pp. 38-45. When asked during a deposition if he had any knowledge about Spartan, Benson refused to answer and asserted his Fifth Amendment privilege. Benson dep., Ex. 21, pp. 7-8.
Several sales representatives testified that Benson personally directed them to make these paybacks to Spartan and advised them that the money was for Spartan's "consulting services." These sales representatives stated, however, that they had never had contact with Spartan nor received services from it. See, e.g., Miller testimony, Ex. 6, pp. 44-56 (Miller testified that from 1977 to 1981 Benson personally directed him to make monthly checks to Spartan for alleged consulting services. He stated that in all those years he had no contact with Spartan nor received any services from Spartan except for a few insubstantial business opportunities that Benson claimed were from Spartan). The evidence shows that these paybacks by the outside sales representatives to Spartan totalled approximately $98,157. See, e.g., Exhibits 1(C)-(G); Miller testimony, Ex. 6, pp. 44-56; Witkin testimony, Ex. 14, pp. 77-78; Ex. 14A.
*1127 Another designee to whom payback checks were frequently made payable was N.J.C. Consultants, whose principal, Neil Cohen, was a personal friend and neighbor of Robert Witkin. Witkin and Cohen testified that at Benson's direction, Witkin convinced Cohen to cash checks from various sales representatives made out to N.J.C. Consultants and deliver the proceeds to Witkin who then delivered the cash to Benson. Cohen's declaration states:
In or about the summer of 1980, Robert Witkin asked me to cash some checks to be drafted to NJC from various sales representatives of Empire. Witkin stated that he was under pressure from Benson to cash such checks from Benson. Following my agreement to this arrangement, Witkin delivered [8 checks].... I deposited all such checks in the account of NJC ... I then withdrew and delivered to Witkin cash in the same amount as the checks. Neither I nor [NJC] kept any of the monies received by NJC by [these] transactions ... all monies were remitted to Witkin. Further, neither I nor [NJC] provided any services in connection with [these] transactions....
Cohen declaration, Ex. 17.
Witkin testified that he delivered all cash proceeds from the checks to Benson. Witkin testimony, Ex. 14, pp. 72-74, 97. See also Witkin testimony, Ex. 14, pp. 58, 90, 96-97. Plaintiff demonstrates through testimony and documentation that total payments to NJC, and subsequently Benson, from this scheme were approximately $14,713. See, e.g., Exhibits 1C, 1E-1F. When questioned about NJC consultants Benson asserted his Fifth Amendment privilege. Benson dep., Ex. 21, pp. 7-8.
Another frequent designee was Polo Management, whose principal was Abe Rosenblatt. At Benson's direction, Rosenblatt cashed payback checks payable to Polo from Empire's sales representatives and remitted 80% of the proceeds in cash to Benson. Leonard Zaretsky, the owner of one of Empire's sales representative firms, Mollen Sales Corporation, and one of Benson's frequent designees, testified on personal knowledge to the accuracy of this allegation. He stated that he had personally delivered payback checks payable to Polo to Rosenblatt and then delivered the cash proceeds (less 20% for Rosenblatt) to Benson. He also testified that he was present when Benson and Rosenblatt discussed this arrangement under which Rosenblatt would cash such checks for Benson in return for 20% of the proceeds. Zaretsky dep., ex. 2, 140-141; pp. 152-152, 20-24, 138, 143. When questioned about Polo Management Benson refused to respond and asserted his Fifth Amendment privilege. Benson dep., Ex. 21, pp. 7-8. The total amount of such payments documented is $100,201. Exhibits 1B-D.
The evidence shows that Benson also used such paybacks to support various personal interests, hobbies and charities. The evidence documents $38,050 in paybacks from Empire's sales representatives in checks payable to various religious, charitable and personal interest organizations in which Benson or his wife were socially active. Several sales representatives testified that Benson often directed them to make their payback checks payable to certain charities or personal interest groups. The sales representatives often gave these checks directly to Benson. See, e.g., Miller testimony, Ex. 6A, pp. 84-86. ("[O]n occasion Mason Benson asked [the sales representatives] to make contributions to a couple of charities ... he was very explicit that these were charities of his and that ... he or his wife were active in the charities.") See also Ex. 1B-G; Witkin testimony, Ex. 14, pp. 51-65, 84; Eckstein testimony, Ex. 9, pp. 65-81, 102.
Benson also used the paybacks to enrich his commemorative stamp collection. He occasionally directed the sales representatives to make their payback checks payable to the United States Postal Service, apparently for the purchase of commemorative stamps. At other times he asked to be paid directly in commemorative stamps. Witkin testimony, Ex. 14, pp. 79-80; Smagler testimony, Ex. 15, pp. 10-11.
The plaintiff's detailed documentation, including the declaration of Stanley Handwerger, a certified public accountant employed *1128 by the SEC for this litigation, demonstrates a total of payments from these sales representatives to Benson or his designees from part I of the scheme in the amount of at least $404,215.93. See, e.g., Hardwerger declaration, Ex. 1, ¶ 2; Exhibits 1A-1G. This figure does not include paybacks to which sales representatives testified but without supporting documentation. See, e.g., R. Blanken testimony Ex. 4, 157; B. Blanken, Ex. 5, p. 108; Ex. 1C; Horchler declaration, Ex. 8, ¶ 4; Pltf's Brief at 9.

Part II  Fictitious Travel and Entertainment Expense Claims
The evidence shows that Benson diverted over $24,940.78 from Empire by directing many of Empire's salaried employees to inflate their weekly expense reports by approximately $100-200 by adding fictitious travel and entertainment expenses. See, e.g., Goetz testimony, Ex. 10, p. 51; Ludak testimony, Ex. 12, p. 56; Smagler testimony, Ex. 15, pp. 77-78.
Numerous employees testified that they were told by Nathan Smagler (Empire's office manager) or Witkin that Benson was directing them to make these weekly false expense claims. See, e.g., Goetz testimony, Ex. 10, pp. 49-61; Read testimony, Ex. 11, pp. 101-103, 107-109, 117, 120-121; Ludak testimony, Ex. 12, pp. 38-43, 46-48. Smagler and Witkin testified that Benson directed them to instruct various employees to add fictitious expenses to their weekly expense reports. Benson then approved these falsified expense reports and received the reimbursement checks. He personally distributed the inflated reimbursement checks to the employees who then cashed the checks and delivered the fictitious portion to Smagler. Smagler and Witkin testified that they kept these proceeds in a secret cash fund which went directly to Benson or occasionally to others at Benson's direction. Witkin testimony, Ex. 14, p. 132; Smagler testimony, Ex. 15, pp. 25, 30, 52-53, 55, 58, 87. Moreover, Witkin testified that Benson often asked him to get the cash proceeds from Smagler and deliver them to him directly. Witkin testimony, Ex. 14, p. 132.
Although several employees testified that at Benson's direction they submitted fictitious expense claims, only two employees, Lawrence Goetz and Gerald Read, kept detailed records of their fictitious claims. Goetz testimony, Ex. 10, pp. 9-10, 42-54, 59; Ex. 1H; Read testimony, Ex. 11, pp. 103-105, 110; Ex. 1-I; Handwerger declaration. The $24,940.78 disgorgement sought by plaintiff based on the misappropriations through false expense claims constitutes only the documented false claims made by Goetz and Read. The additional similar misappropriations testified to by other employees, but without documentation or contemporary tally is not included in that figure.

Part III  Misappropriated Refunds on Airline Tickets
The proofs also show that Benson misappropriated $73,045.28 in refunds on unused airline tickets purchased by Empire. Smagler, at Benson's request, obtained refund checks from travel agents for unused airplane tickets (payable to whomever Benson would direct but generally Smagler). Smagler would cash the checks. The evidence shows that these credits were diverted from Empire.

Part IV  Unearned Commissions
Persuasive testimony of Leonard Zaretsky, principal of Mollen Sales Corporation (a sales representative), showed that Benson directed Empire to pay Mollen (Zaretsky in particular) a commission on two of Empire's accounts, Sam Solomon and Toys `R Us, which Mollen never serviced. Zaretsky dep., Ex. 2, pp. 42, 117-118, 125, 127-129, 133-134. Zaretsky further testified that at Benson's direction, he paid these unearned commissions to Benson or one of his designees. The amount misappropriated through these unearned commissions is included in the payback scheme of Part I. See Ex 1B, Schedule 2; Handwerger declaration, Ex. 1, ¶ 6.

Defendant Benson's Position in Opposition to the Motion
In response to the complaint, defendant Benson submitted an answer containing general denials and a number of affirmative defenses, including the assertion that *1129 he used the funds for corporate and charitable purposes. When the SEC first sought to take discovery, Benson was uncooperative and obstructive. He repeatedly refused to disclose properly demanded discovery, despite three court orders of production. Thereafter when noticed to disclose the evidence supporting the contentions in his pleadings, he refused to disclose claiming his privilege under the Fifth Amendment.
Plaintiff moved for sanctions including judgment by default for plaintiff's total failure to provide discovery. By Memorandum and Order of April 9, 1985, I denied (implicitly) plaintiff's application for default judgment, but granted sanctions in the form of precluding Benson "from offering evidence in support of ... positions on which he has declined to furnish disclosure. ..." The Fifth Amendment, of course, protects Benson from compelled testimony. He may not be required to testify or furnish discovery. On the other hand, it would be abuse of the Fifth Amendment privilege to allow a civil litigant to use it to offer proofs while denying the adversary discovery of his contentions.
My ruling essentially required the SEC to prove its case by its evidence, while denying Benson the unfair advantage of asserting evidence as to which he had withheld disclosure. See Lyons v. Johnson, 415 F.2d 540, 542 (9th Cir.1969), cert. denied, 397 U.S. 1027, 90 S.Ct. 1273, 25 L.Ed.2d 538 (1970).
Defendant contends the preclusion order should not apply to a motion for summary judgment. There is no reason or justification for his contention. My ruling required that plaintiff justify its entitlement to relief by evidence. The plaintiff's evidence fully demonstrates its contentions. Plaintiff is entitled to judgment on this record unless the defendant shows the existence of evidence raising a material issue of fact. Defendant has, however, chosen the tactic of seeking to bar plaintiff's access to the evidence. At least to the extent of pleading the Fifth Amendment, that is his right. But, in a civil case, he cannot have it both ways. By hiding behind the protection of the Fifth Amendment as to his contentions, he gives up the right to prove them. By his initial obstruction of discovery and his subsequent assertion of the privilege, defendant has forfeited the right to offer evidence disputing the plaintiff's evidence or supporting his own denials. There is no reason why judgment should not be granted on this record.
Benson also asks that the entry of judgment be deferred to permit him to conduct discovery. This is an unreasonable position which seeks to escape the remedial effect of my earlier order. It is particularly notable that he does not offer to give up the shield of the privilege. He seeks only to develop and assert defenses without yielding his shield of protection. He cannot have it both ways.
Furthermore, his new position is untimely. He has had full opportunity to determine his strategy and take action in support of it. It is only now that the SEC has amassed a powerful case on the motion for summary judgment that Benson proposes to pursue a slightly different strategy. It is true that ordinarily a litigant is allowed to take discovery before being required to demonstrate the existence of material facts in dispute to counter a motion for summary judgment. Benson, of course, had the opportunity to take discovery for a year. He did not do so, adopting rather the tactic of hiding behind obstruction and the privilege. To permit him to reopen discovery now would abuse the plaintiff's rights. Rule 56(f) enables "a party who has no specific material contradicting his adversary's presentation to survive a summary judgment motion [only if] he presents valid reasons justifying his failure of proof." 10A Wright, Miller and Kane, Fed.Prac. and Procedure: § 2740 at 530 (1983). See also Bongiovanni v. N.V. Stoomvaart-Matts "Oostzee", 458 F.Supp. 602, 606 (S.D.N.Y.1978). Benson presents a no valid reasons. The fact that he failed to take or attend a single deposition during a year of discovery does not justify delaying decision on plaintiff's motion to enable him to conduct such untimely discovery now. Defendant chose his tactic of obstruction *1130 and assertion of the privilege and is bound by his choice.
Benson also contends that most of the SEC's evidence is inadmissible hearsay. This contention is without merit. In each instance on which the court has relied, the testimony of plaintiff's witnesses was as to matters of which they had personal knowledge and business records. Also, much of plaintiff's most important evidence was testimony as to instructions given by Benson to others, which are not hearsay but conduct, and as to Benson's own statements, which are received as exceptions to the hearsay rule being the admissions of the party opponent. Rule 801(d)(2)(A), Fed.R. Evid. To the contrary, it is Benson who seeks to rely on hearsay. He seeks to rely on portions of the testimony of witnesses deposed by plaintiff (which plaintiff did not offer) in which those witnesses repeated Benson's exculpatory explanations for his handling of company accounts. In general, the witnesses Benson relies on do not claim to have personal knowledge of the matters he relies on them for. See, e.g., Smagler testimony, Ex. 15, pp. 25, 86-87; Ex. 15A, pp. 55-58; Witkin testimony, Ex. 14D, pp. 122-23.

Federal Securities Laws Violations

A. Section 17(a) of the Securities Act of 1933

Plaintiff charges Benson with violating Section 17(a) of the Securities Act in Empire's offer and sale of its common stock and subordinated convertible debentures in 1979 and 1981 respectively, by filing false and misleading securities registration statements, signed by Benson. See Exhibits 22, 23, 26 at 1. Section 17(a) is a general anti-fraud provision which provides:
It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mail, directly or indirectly
(1) to employ any device, scheme or artifice to defraud, or
(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or
(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.
Section 17(a) has been broadly construed. Filing registration statements without disclosing even one "material fact necessary in order to make the statements made in the light of the circumstances under which they were made not misleading" violates Section 17(a). See SEC v. Bangor Punta Corp., 331 F.Supp. 1154, 1160 (S.D. N.Y.1971). The registration statements filed in connection with Empire's December 1979 initial public offering of its common stock and its November 1981 public offering of convertible subordinated debentures were unquestionably misleading in their (1) failure to disclose Empire's actual selling and administration expenses and income (the statement of operations setting forth Empire's expenses, for example, failed to disclose that portions of the alleged expenses never existed); (2) failure to disclose the amounts misappropriated by corporate officials; (3) failure to disclose that Benson had systematically caused Empire's books and records to be falsified by not recording or reporting the actual expenses and misappropriations and (4) failure to disclose in the statement of business and operations the systematic paybacks and the payment of fictitious unearned commissions. See, e.g., Ex. 22 at 16-23; Ex. 23 at 19-24.
Moreover, although scienter is not necessary to establish violations of Sections 17(a)(2) and (3), Aaron v. SEC, 446 U.S. 680, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980), the unrebutted evidence of the SEC demonstrates that Benson clearly acted with scienter. "Scienter is shown when a party acts with a mental state embracing intent to deceive, manipulate or defraud." Id. at 686. Moreover, this mental state *1131 may be shown by demonstrating that a defendant had knowledge of specific material facts and failed to make adequate disclosure. See, e.g., Decker v. Massey-Ferguson, Ltd., 681 F.2d 111, 120 (2d Cir. 1982). The evidence demonstrates that Benson intentionally engaged in a scheme to "deceive" and to "defraud" Empire and that he had knowledge of the material facts he failed to disclose. Finally, it is established that Benson used interstate commerce in connection with the misstatements as is required under Section 17(a). See Exhibits 22, 29; Statement ¶ 97.
The evidence offered by the SEC in support of its claim is overwhelming and unrebutted. Accordingly, I find that summary judgment should be granted as to Benson's violation of Section 17(a).

B. Section 10(b) and Rule 10b-5

Plaintiff also charges Benson with violating Section 10(b) of the Securities Act and Rule 10b-5 by making numerous misstatements and material omissions in Empire's annual and quarterly reports, proxy statements and security registration statements filed with the SEC and disseminated to shareholders. Section 10(b) and Rule 10b-5 prohibit fraudulent devices, misstatements and practices in connection with the purchase or sale of any security. Rule 10b-5 provides:
It shall be unlawful for any person, directly or indirectly by use of any means or instrumentality of interstate commerce or of the mails or any facility of any national securities exchange
(a) to employ any device, scheme, or artifice to defraud;
(b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading or
(c) to engage in any act, practice or course of business which operates as a fraud or deceit upon any person in connection with the purchase or sale of any security.
The "in connection with" requirement has been liberally construed in this Circuit. See Stockwell v. Reynolds & Co., 252 F.Supp. 215, 219 (S.D.N.Y.1965). ("The words `in connection with' ... in Section 10(b) ... have been construed more liberally in order to carry out the intent of the Act, which is designed to protect investors against fraud.") The standard requires "only that the device employed, whatever it might be, be of a sort that would cause reasonable investors to rely thereon, and, in connection therewith, so relying, cause them to purchase and sell a corporation's securities." SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 860 (2d Cir.1968). Moreover, Section 10(b) and Rule 10b-5 have "always been acknowledged as catchall[s]" to prevent manipulative devices. Id. at 859. The proxy solicitation materials filed by Empire and used to solicit votes from existing shareholders on internal corporate matters, do not satisfy the "in connection with" requirement since they were unrelated to the purchase or sale of securities. The registration statements and annual and quarterly reports, on the other hand, do satisfy the requirement. They are clearly documents that an investor would rely on in deciding whether to purchase Empire's securities.
Moreover, the false disclosures and material omissions regarding, inter alia, diversion of corporate funds and the actual yearly expenses and income of Empire are clearly "material" as is required under Section 10(b) and Rule 10b-5. A "reasonable [investor] would attach importance [to the information] in determining his choice of action...." SEC v. Texas Gulf Sulphur Co., 401 F.2d at 849; Restatement, Torts § 538(2)(a). Finally, as discussed above, it is clear that Benson acted with scienter as is required for Section 10(b) and Rule 10b-5 violations. See Aaron v. SEC, supra. The record establishes without question that Benson's deceptive and misleading statements and omissions were intentional and designed to prevent detection of his scheme.
*1132 Again, defendant fails to rebut the substantial evidence offered by the SEC in support of its claim. Accordingly, summary judgment is granted as to defendant's violation of Section 10(b) and Rule 10b-5.

C. Rule 13b2-2 Under the Exchange Act

Rule 13b2-2 under the Exchange Act provides:
No director or officer of an issuer shall, directly or indirectly, (a) make or cause to be made a materially false or misleading statement, or (b) omit to state or cause another person to omit to state a material fact necessary in order to make statements made, in light of the circumstances under which such statements were make, not misleading to an accountant in connection with (1) any audit or examination of the financial statements of the issuer required to be made pursuant to [Section 13(a)]; (2) the preparation or filing of any document or report required to be filed with the Commission pursuant to [Section 13(a)].
The evidence presented by plaintiff shows that from 1979 to 1982 Benson made numerous false and misleading statements and omissions of fact to Empire's auditor, Main Hurdman in connection with its audit of Empire's financial statements filed pursuant to Section 13(a) as part of Empire's annual reports on form 10-K for fiscal 1979-1981. In connection with each year's audit Benson signed numerous management representation letters to Main Hurdman assuring it that:
... to the best of [any undersigned officers] knowledge ... [all] reimbursement to employees for expenditures made on behalf of the Company are for a bona fide Company expense ... no irregularities were discovered by the Company ... that have not been disclosed to you; there is nothing reflecting negatively upon the honesty of members of our organization ... [n]o events have occurred and no facts have been discovered which require further adjustment to or disclosure in the financial statements. ..."
Exhibits 19 and 19A, D, E, F.
Plaintiff's proofs show that these representations were false. No disclosures were made, for example, regarding such "irregularities" as inflated expense claims, payback schemes or payment of unearned commissions. These misrepresentations are "material" as is required under Rule 13b2-2. See, e.g., Burger v. CPC Intern., Inc., 76 F.R.D. 183, 187 (S.D.N.Y.1977); SEC v. Texas Gulf Sulphur Co., 401 F.2d at 849.
It is not necessary to determine whether defendant violated the other numerous provisions of the Federal securities laws as alleged. Plaintiff has more than satisfied its burden of showing entitlement to judgment under Rule 56. Defendant has not come forward with any information or arguments to rebut plaintiff's claims as is required to defeat a motion for summary judgment. See, e.g., SEC v. Research Automation Corp., 585 F.2d 31, 33 (2d Cir. 1978). Although Benson is precluded from introducing evidence in support of his assertions and defenses, he is not barred from demonstrating that plaintiff's evidence fails to support its claims. This he has failed to do. Accordingly, summary judgment is granted as to defendant's violations of Section 10(b), Rule 10b-5 and Rule 13b2-2 of the Securities Exchange Act of 1934 and Section 17(a) of the Securities Act of 1933.

Remedies

A. Permanent Injunction

The SEC seeks a permanent injunction barring defendant from further violations of the Federal securities laws pursuant to Section 20(b) of the Securities Act of 1933 and Section 21(d) of the Securities Exchange Act of 1934. These provisions provide for injunctive relief when a person "is engaged or about to engage" in illegal acts. See SEC v. Management Dynamics, Inc., 515 F.2d 801, 810 (2d Cir.1975). Accordingly, it is well established in this Circuit that the "critical question" in determining whether to issue an injunction is whether *1133 "there is a reasonable likelihood that the wrong will be repeated." SEC v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1100 (2d Cir.1972). See also SEC v. Commonwealth Chemical Securities, Inc., 574 F.2d 90, 99 (2d Cir.1978) (Friendly, J.) ("Except for the case where the SEC steps in to prevent an ongoing violation, [the] language [of the securities laws] seems to require a finding of `likelihood' or `propensity' to engage in future violations."); SEC v. Management Dynamics, Inc., 515 F.2d at 807; SEC v. Kalvex Inc., 425 F.Supp. 310 (S.D.N.Y.1975).
This reasonable likelihood test has been liberally construed. In deciding whether the "likelihood of future violations" test has been satisfied the court's focus has been as much retrospective as prospective. "The commission of past illegal conduct is highly suggestive of the likelihood of future violations ... past violations may in certain circumstances justify an inference that a defendant is likely to violate the law in the future if not enjoined." SEC v. Management Dynamics Inc., 515 F.2d at 807. See also SEC v. Commonwealth Chemical Securities, Inc., 574 F.2d at 98-101 (Judge Friendly found a reasonable likelihood of future violations sufficient to permanently enjoin defendants from future securities violations despite the fact that defendants' securities violations had occurred over three years earlier and that they were no longer in the securities business and were prohibited from returning). In deciding whether to grant an injunction, courts are to consider the "totality of the circumstances" and whether the violation was just an "isolated occurrence." SEC v. Management Dynamics, 515 F.2d at 807.
Accordingly, under the standards articulated in this Circuit I find that despite Benson's resignation from Empire, his long and continuous pattern of securities violations during his term of office demonstrates a reasonable likelihood of future violations warranting a permanent injunction.

B. Disgorgement

Plaintiff seeks an order of disgorgement in the amount of $502,201.99 for Benson's misappropriations from Empire.[3] Plaintiff has shown by substantial and persuasive proof that Benson misappropriated the monies alleged. Even without the benefit of inferences permissibly drawn from defendant's assertion of his Fifth Amendment privilege, the evidence shows that Benson misappropriated the funds.
Disgorgement constitutes the giving up or divestment of ill-gotten funds flowing from a defendant's unlawful conduct. See, e.g., SEC v. Manor Nursing Centers, Inc., supra; SEC v. Commonwealth Chemical Securities, Inc., supra. Once the SEC has shown the existence of a fraudulent scheme to misappropriate corporate funds, defendant bears the burden of demonstrating that he received less than the full amount allegedly misappropriated and sought to be disgorged. SEC v. World Gambling Corp., 555 F.Supp. 930, 931 (S.D.N.Y.1983) (Sofaer, J.). Defendant has failed to meet this burden. Although he asserts that the alleged misappropriated funds were used for "corporate purposes," he fails to offer even the slightest substantiation of his contention.
Despite my April 1985 preclusion order and despite Benson's refusal to furnish any discovery concerning his use of these allegedly misappropriated funds, Benson now attempts to introduce evidence to demonstrate corporate use. Even if I were to consider all of the evidence offered by Benson, none of it is even marginally persuasive or competent. For example, Benson introduces testimony from Witkin and Smagler stating that they did not know what Benson used the money for but that they thought, based on Benson's representations to them, that some of the money might have been used for business related *1134 purposes. As the witnesses made clear, neither of them had personal knowledge of Benson's use of the money. Moreover, despite their positions in the company, neither of them could identify a single instance in which they knew the money was used for corporate purposes.
Benson's assertion that portions of the misappropriated money was used for the corporate purpose of "supplementing salaries", even if true, serves only to strengthen plaintiff's claim. Benson relies on testimony from Zaretsky, Witkin and others stating that some of these misappropriations may have been used to supplement salaries. See, e.g., Zaretsky testimony, Ex. 2, p. 133; Witkin testimony, Ex. 14, p. 43. These "salary supplements" were nothing more than payoffs to participants in Benson's fraudulent scheme. Moreover, even if these had been legitimate corporate payments, the practice was still in violation of the Federal securities laws since none of these supplements were disclosed in the company's financial records or filings with the SEC. Finally, the alleged salary supplements to employees were insubstantial and accounted for only a fraction of the over $500,000 Benson misappropriated.
Benson also contends some of the funds went to charities. He argues that these payments cannot be disgorged because they were not used for his benefit. The argument is erroneous. The manner in which Benson chose to spend his misappropriations is irrelevant as to his objection to disgorge. Whether he chose to use this money to enhance his social standing through charitable contributions, to travel around the world, or to keep his co-conspirators happy is his own business.

Conclusion
Plaintiff's motion for summary judgment is granted as to defendant's violations of Section 10(b), Rule 10b-5, and Rule 13b2-2 of the Securities Exchange Act of 1934 and Section 17(a) of the Securities Act of 1933. Accordingly, defendant is ordered to disgorge $502,201.99 in misappropriated funds and is permanently enjoined from future violations of the Federal securities laws.
SO ORDERED.
NOTES
[1] Specifically, the SEC seeks summary judgment against Benson for violations of Section 17(a) of the Securities Act of 1933 and Sections 10(b), 13(a), 13(b)(2), and 14(a) of the Securities Exchange Act of 1934 and Rules 10b-5, 12b-20, 13a-1, 13a-13, 13b2-1, 13b2-2, 14a-3, and 14a-9 thereunder.
[2] Prior to December 1979, Carolina was a wholly owned subsidiary of Mallory Randall Corporation, a publicly-held corporation. In July 1979, Mallory Randall incorporated Empire and used it as a vehicle to sell Carolina to the public. In December 1979, all of Empire's shares were sold in a public offering and the proceeds were used to purchase all of Carolina's outstanding stock from Mallory Randall Corporation.
[3] The breakdown is as follows: $404,215.93 (payback scheme); $24,940.78 (fictitious expense claims), and $73,045.28 (airline refunds).