SECURITIES AND EXCHANGE
COMMISSION, Plaintiff,

v.

WORLD GAMBLING CORPORATION;
Surgent, John W. Jr.; Sroka, Mark A.;
Poole, Harry; Hamley, James J.; Norbay Securities Inc.; Scala, Lewis; Feintuch, Bernard, Defendants.

No. 82 Civ. 3821 (ADS).

United States District Court,
S.D. New York.

Jan. 31, 1983.

Securities and Exchange Com'n, Donald N. Malawsky, Regional Adm'r, New York Regional Office, New York City, for plaintiff; Seth T. Taube, Sheree F. Levine, Marc D. Powers, of counsel.

Ormsten & Evangelist, New York City, for defendant Norbay Securities Inc. Franklin D. Ormsten, New York City, of counsel.

Peter E. Tommaso, Kew Gardens, for defendant Lewis Scala.

Schulman & Laufer, Brooklyn, N.Y., for defendant Mark Sroka; Robert Baumol, Brooklyn, N.Y., of counsel.

## MEMORANDUM OPINION AND ORDER

SOFAER, District Judge:

This is an action by the SEC to obtain injunctions against six defendants prohibiting them from violating the registration and antifraud provisions of the federal securities laws. 15 U.S.C. §§ 77e(a), (c), 77q(a), 78j (1976). Preliminary injunctions issued after a hearing against three of the defendants, World Gambling Corp. ("WGC"), and its two principal officers, John W. Surgent and Mark A. Sroka. The three were thereafter ordered to show cause why these injunctions should not be made permanent. These defendants were the main culprits in a scheme to sell unregistered securities of WGC on fraudulent representations, and the Court preliminarily found on the record that the conduct and background of these defendants makes it likely that they may engage, or with respect to WGC that it may be used, in further illegal conduct of the types enjoined.

■ Pursuant to the Court's order, the defendant Surgent appeared and sought a further opportunity to contest his liability, as well as to oppose the SEC's request for an order of disgorgement. He failed to appear at the hearing scheduled at his request, however, and therefore has defaulted. In any event, the SEC established in its able brief on this issue that Surgent would have been precluded from contesting liability by the doctrine of collateral estoppel, given the evidence introduced against him at his criminal trial. Sroka also appeared pursuant to the order to show cause, but he sought to contest only the amount for which he ought to be ordered to disgorge, claiming that he received only about $5,000 of the sums obtained in the scheme. Therefore, on the basis of the findings made on the record, and in the orders issued herewith, and given the concessions and/or de-

faults of WGC, Surgent, and Sroka, the injunctions against them are hereby made permanent. In addition, for the reasons given in the findings entered against Surgent and Sroka, and the stipulations in the record, the orders of disgorgement sought concerning those individuals are wholly justified. The evidence shows that Sroka was a knowing partner with Surgent in the crimes they committed, and that he pleaded guilty to transactions involving proceeds of $13,000. His participation in the crimes was extensive, and necessary to the scheme's success, and therefore justifies his being held jointly and severally liable for the full amount of the profits obtained, or $68,486.90 *see* Pl.Ex. 200, though not for the amount obtained independently by Surgent in looting the subsidiary of WGC known as AEI. *See, SEC v. R.J. Allen & Assoc., Inc.,* 386 F.Supp. 866, 880–81 (S.D.Fla.1974); *Ross v. Licht,* 263 F.Supp. 395, 410–11 (S.D. N.Y.1967).

■ Sroka properly argues that disgorgement serves somewhat different purposes from those served by joint-tortfeasor liability. While disgorgement functions primarily to prevent a party's unjust enrichment and thereby to deter improper conduct, joint liability serves primarily to make whole the injured party, and in the process to punish if necessary any one legally responsible. To the extent that joint liability requires payment of a sum greater than the profits unlawfully gained by the fraudulent transactions, it is a penalty and is therefore improper. *See SEC v. Blatt,* 583 F.2d 1325, 1335 (5th Cir.1978); *SEC v. Manor Nursing Centers,* 458 F.2d 1082, 1104 (2d Cir.1972). These principles are of no assistance to Sroka in this case, however. Had Sroka proved that he obtained only a certain amount from the scheme, then he could conceivably have argued convincingly that, despite his extensive participation in the conspiracy, he should not be required to disgorge what he did not receive. But he failed to prove that he received any specific amount, or even that he received less than a given amount. Consequently, the SEC should not be prevented from collecting the amount obtained

in the scheme from either or both Surgent and Sroka. The two culprits would be free of course to sue one another for contribution if one claims that he was required to pay what the other received.

Bernard Feintuch, a former registered representative with the defendant, Norbay Securities, has consented to a permanent injunction, as has Harry Poole. In addition, the SEC has obtained a default against the defendant James J. Hamley. The SEC now seeks to enjoin permanently Norbay Securities and its trader/registered representative Lewis Scala to prevent their violating the registration and antifraud provisions in the future, as well as an order that they disgorge their profits. The relevant parties have stipulated that the present record, made on motion for a preliminary injunction, will be considered complete for purposes of deciding whether a permanent injunction should issue, and have reached stipulations on the profits obtained. On the basis of the following findings and conclusions, a permanent injunction will issue with respect to Scala but not with respect to Norbay. Norbay and Scala will, however, be required to disgorge all profits made on their transactions of WGC stock to the extent described below, and will remain subject to this Court's jurisdiction by reason of their stipulations on the record to refrain from violating the laws and regulations described in the SEC's proposed orders of permanent injunction.

The facts relating to the scheme to defraud perpetrated by Surgent and Sroka are set out in the preliminary injunctions issued against them. Findings of Fact Nos. 1–53 are hereby adopted for present purposes, from the order respecting Surgent. On the basis of those findings it is clear that Scala and Norbay sold unregistered WGC stock, and that they sent their clients false information regarding that stock. In addition, the evidence showed that Scala should have become suspicious when he arranged with Surgent for the sale of WGC stock to Norbay in an account in the name of Traxler, a third person with whom Scala did not deal. Scala later opened another account at the request of Surgent in the name of James Marshall, a real estate broker who testified that no one from Norbay ever contacted him concerning the account. Furthermore, while Scala called the transfer agent regarding WGC stock, he did so only after having already sold some of the shares, and in the present circumstances that measure was insufficient to constitute proper care. See Babcock & Co., 44 S.E.C. 350 (1970). Scala failed to carry out his responsibility for checking out the financial facts of WGC and maintaining a proper file for Norbay, which was a market maker in WGC stock. See 17 C.F.R. 240.15c2–11 (1982). He also communicated to his customers all the false information he received about WGC, and he told his customers, including Albert Markson, without any adequate basis, that WGC had a promising future and competent management. Finally, he bought and sold WGC stock through a nominee account, making a profit while his customers lost money.

Applying the factors approved in SEC v. Commonwealth Chemical Securities, Inc., 574 F.2d 90, 100 (2d Cir.1978) to Scala, there is a reasonable likelihood that he would commit future violations of the registration and antifraud provisions of the federal securities laws. Scala's conduct may not have been wilful, but it was clearly reckless. He should have checked further into Surgent's relationship with Traxler, among other things. Furthermore, with respect to his own purchases and sales he knowingly favored himself over his customers. After his visit to WGC in early 1980, when he found Surgent "evasive," he should have taken remedial action; instead, he thereafter sold to Markson WGC stock on the representation that WGC was well managed, and continued to sell stock to other customers. Although Scala engaged in this conduct only with respect to WGC stock, his activities extended over a period of months, involved several customers, and violated at least three fundamental legal obligations that Scala had specifically undertaken in behalf of Norbay: (1) to take reasonable steps to insure that the stock was registered; (2) to check on the accuracy of WGC representa-

tions before passing them on to customers; and (3) to maintain a due-diligence file to justify Norbay's role as market-maker.

Scala is willing to assure the Court that he will abide by the relevant laws, and has offered to sign a stipulation to that effect. He has not admitted, however, that his conduct was deficient, and his present position at Norbay gives him the capacity to violate the law again. The proposed stipulation that Scala is willing to enter into is in any event not a proper substitute for an injunction. The SEC cannot be deprived of the relief it seeks by a device that essentially grants that relief but substitutes judicial enforcement for SEC enforcement. Here, given the nature and degree of Scala's violations, an injunction is proper.

Applying the same factors to Norbay Securities, a permanent injunction is not an appropriate remedy. Norbay it is true is responsible for the conduct of its employees and is derivatively liable for violating the laws involved. But even though a finding of scienter may not be a prerequisite for injunctive relief, it is a relevant consideration when such a harsh equitable remedy is being sought. The evidence failed to establish that Norbay's owner and controlling officer, Benjamin Taormina, knew anything about WGC that should have led him to be suspicious as to its registered status or as to the statements issued concerning its finances or activities. Taormina trusted his principal trader, Scala, to satisfy all the obligations at issue in this case, and no proof was offered to demonstrate that he knew or should have known of Scala's failure to satisfy these obligations. The Court accepts Taormina's testimony that he believed Scala had checked out WGC and was maintaining a due-diligence file on the company. Not only was the testimony credible, but Norbay's prior business record supplied it with significant support; Norbay has done many underwritings, has sold many securities as a market maker, and, according to Taormina's uncontradicted claim, had never before sold unregistered stock or acted as a market maker without first obtaining proper infor-

mation. Taormina was not grossly reckless, as the SEC claims, in trusting Scala, since Scala has worked complaint-free at Norbay for several years, and was well aware of his obligations.

Many defects have existed in Norbay's operation, and some may well continue to exist, including inadequate compliance supervision. Those defects have been corrected in most respects, however, especially insofar as they relate to the statutory violations sought to be enjoined. Furthermore, while the SEC established that Norbay's supervision was deficient in general, those deficiencies had no causal relationship to Scala's conduct. Scala well appreciated his obligations and, as a principal trader, was himself a person who had supervisory authority. While for Scala the incident was significant, for Norbay the WGC stock was only one of many issues handled by its traders, and the only one on which Norbay found itself in violation of the registration and antifraud provisions. Other violations by Norbay are not insignificant, and although they have been considered, they do not indicate that Norbay will intentionally engage in the conduct to be enjoined. Moreover, new procedures undertaken by Norbay make it highly unlikely that these violations will occur again by accident. Based on the lack of similar instances, and the credibility of Mr. Taormina, Norbay is unlikely to engage further in the conduct actually sought to be enjoined.

No weight has been given in reaching these findings and conclusions to the fact that Norbay and Benjamin Taormina offered to stipulate that they will not engage in any of the acts sought by the SEC to be enjoined. Nevertheless, the stipulation is accepted as additional corroboration for the Court's view, and as a deterrent against any such conduct, since it authorizes use of the contempt power or any other proper remedy to punish the signatories for violating the stipulation.

The SEC repeatedly emphasized at trial that Norbay is engaged in selling "penny" stocks, or highly speculative securities. The clear suggestion implicit in the govern-

934

ment's case is that the public would be better off without such an operation. Yet, the SEC failed to prove that the public is any less inclined to gamble on stocks than on horses or the lottery; indeed the record shows that those lawful options present far greater risks than investing in stocks at Norbay. Taormina, Scala, and several customers testified without contradiction that everyone dealing in "penny" stocks at Norbay is told and knows that these stocks are highly speculative; nevertheless, Taormina said without contradiction that WGC is the only stock Norbay has either underwritten or for which it has made a market, that has been a total loss. While other "penny" stock operations may be illegitimate, the evidence shows, as Norbay's counsel artfully put it, that his clients are not "telephonic thugs."

Perhaps the SEC's desire to obtain permanent injunctions against Norbay and Scala led it to overlook the far more appropriate sanction of disgorgement. After the Court suggested the possible propriety of disgorgement, however, the SEC agreed that disgorgement would be proper, and has since established a legal and evidentiary basis for such orders. The parties have stipulated that Norbay made a total profit, less the cost of the stock and transfer taxes, of $29,000 from its sales of WGC stock, and that the total profit was divided as follows: $11,700 to Norbay, $11,700 to Scala, and $5,600 to Feintuch.

Norbay's attorney argues that disgorgement has been reserved for egregious cases, and as a method for deterring improper activity; he contends that Norbay's violations were not egregious, and that no deterrent purpose could be served by ordering disgorgement, since Norbay did not act wilfully. No convincing proof has been advanced, however, that the SEC seeks disgorgement only for egregious conduct. The SEC, spurred on primarily by Second Circuit decisions, appears, in fact, to have "moved decisively to utilize" ancillary remedies, including disgorgement, since the 1960s, to remedy a variety of violations. Farrand, *Ancillary Remedies in SEC Civil Enforcement Suits*, 89 Harv.L.Rev. 1779,

1800 (1976); *see, e.g., SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082 (2d Cir. 1972). Counsel for Norbay concedes, in fact, that disgorgement is a less onerous remedy, at least in this case, than an injunction, and the SEC failed initially to seek it only on the premise that an injunction would be obtained.

In any event, however limited the SEC's prior use of disgorgement, it is a remedy that gives courts flexibility to adjust the punishment for securities violations to fit the wrongful conduct and to accomplish Congress' objectives. While Norbay's owner was not shown to have acted intentionally, his principal trader and one other employee both knowingly violated the law. Disgorgement of Norbay's profit under these circumstances will serve both general and specific deterrent proposes by signalling principals of securities firms that they will not be permitted to profit from securities violations at their customers' expense, and by encouraging Norbay's owner in particular to exercise greater care. Furthermore, while disgorgement has been said to serve more important interests than the compensation of investors, *SEC v. Commonwealth Chemical Securities, Inc.*, 574 F.2d 90, 102 (2d Cir.1978), that principle is a far cry from the proposition that restitution is an improper end. Compensatory awards are "uniquely suited to redress or cancel unfairness and promote investor confidence in securities transactions." Farrand, *supra*, 89 Harv.L.Rev. at 1803. And the need for disgorgement is especially keen in this case, since the small amounts lost by individual investors make the Act's private remedies less effective than in cases where substantial monetary incentives encourage such actions. Norbay must repay the profit it made, even if the only purpose served thereby were to restore funds improperly obtained from its customers.

Under the circumstances of this case, however, Norbay should not be required to disgorge any more than the profit it made, i.e. $11,700.00. Both Scala and Feintuch are the more responsible parties, having been shown to have made misrepresenta-

tions, so the circumstances do not warrant holding Norbay financially responsible for their activity. On the other hand, neither do the circumstances warrant reducing this amount by Norbay's overhead costs or by a hypothetical corporate income tax rate. Norbay's only true overhead costs would be the marginal costs of handling these specific transactions—an amount much lower than its average cost per transaction. Norbay's true taxes on the profit are not even known, since there is no indication of what taxes were in fact paid, what impact would have resulted in taxes if these transactions were eliminated, or what rights Norbay has to offset its loss caused by disgorgement in future tax years. Even if these computations were appropriate, they are not worth making in this case, given the small amount at issue. The "profit obtained" cannot be said to be a punitive standard for disgorgement, even though it may be slightly overstated by overhead and income taxes, and in any event that standard remains the proper measure for achieving restitution, which is itself a proper objective.

The case for requiring Scala to disgorge is in some respects stronger than for requiring Norbay to do so, since he committed some intentionally wrongful acts. On the other hand, the deterrent objectives in punishing Scala are adequately vindicated by the injunction to be issued against him, and a disgorgement of his actual profit, or $11,-700. Scala's conduct was seriously deficient, but his behavior was not as egregiously fraudulent as that of Surgent or Sroka; to an extent, he too was a victim of the scheme. To require Scala or Norbay to pay also the profits obtained by Feintuch would constitute a fine, not disgorgement, since Feintuch clearly obtained and retained those funds. *See SEC v. Blatt,* 583 F.2d 1325, 1335 (5th Cir.1978); *SEC v. Manor Nursing Centers,* 458 F.2d 1082, 1104 (2d Cir.1972). In any event, the order would be unwarranted under the circumstances of this case.

In conclusion, the injunctions and disgorgement sought by the SEC against WGC, Surgent, and Sroka, are granted. An injunction will also issue against Scala, but he will be required to disgorge only $11,700. An injunction will not issue against Norbay, but it too will be required to disgorge its profits of $11,700. All payments will be made to the SEC in the manner provided in the applicable judgments, and the SEC will disburse the funds collected in a manner designed fairly to compensate the victims of these frauds. All other issues having been resolved, this case will be closed upon the entry of the judgments signed this date, and judgments concerning Norbay and Scala that incorporate the findings and rulings contained in this opinion.

SO ORDERED.