SECURITIES AND EXCHANGE
COMMISSION, Plaintiff,

v.

HUGHES CAPITAL CORP.,
et al., Defendants.

Civ. No. 88–5238 (WGB).

United States District Court,
D. New Jersey.

Feb. 16, 1996.

Securities and Exchange Commission by Larry P. Ellsworth, Julie K. Lutz, Erich T. Schwartz, Cynthia M. Parrish, Joanne Cronrath Bamberger, Washington, DC, for Plaintiff.

Raskin & Raskin, P.A. by Robert J. Becerra, Miami, Florida, for Susan Lachance, Howard Ackerman, Lionel Reifler.

Ira Victor, Scottsdale, AZ, pro se.

Frederic E. Mascolo, Waterbury, CT, pro se.

Gilbert Beall, North Richland, TX.

David Herzog, Fromkin, Herzog & Becker, Omaha, NE.

Howard Blumenthal, Beverly Hills, CA.

Harley Schrager, Personal Representative of the Estate of John Knoblauch, c/o Jon Lance Jabenis, Gallup & Schaefer, Omaha, NE.

### OPINION

BASSLER, District Judge:

Plaintiff, the Securities and Exchange Commission ("SEC"), moves for summary judgment as to the amount of liability for each defendant. This court's jurisdiction is pursuant to 28 U.S.C. § 1331, 15 U.S.C. § 78aa and 15 U.S.C. § 77v(a). For the reasons set forth in this opinion, plaintiff's motion is GRANTED as to disgorgement and DENIED as to restitution.

1. The Court adopts the statement of facts contained in the "Background" sections of its Opin-

## I. BACKGROUND

This action involves violations of the federal securities laws committed in connection with the initial public offering and subsequent sales of Hughes Capital Corporation ("Hughes Capital") securities. Essentially, the defendants, with varying levels of involvement, orchestrated a sham public offering in which they acquired all of the offered units, artificially inflated the securities' price by disseminating false and misleading information about Hughes Capital's business prospects, and then sold them at a substantial profit. The Court has granted summary judgment as to the liability of each of the defendants.[1]

On the summary judgment motions relating to liability, the court determined the following: (1) Hughes Capital, Reifler, Beall, and Knoblauch "acted intentionally in organizing and carrying out the Hughes IPO fraud", Opinion filed September 2, 1993 at 27; (2) Victor negligently opened nominee accounts through which the defendants could secretly purchase units of the Hughes public offering; (3) Lachance and Mascolo negligently approved and issued materially false press releases; and (4) Ackerman was negligent in "assisting in the closing of the fraudulent Hughes Capital public offering and for receiving and concealing the proceeds from the sale of Hughes Capital Securities." Opinion filed December 9, 1994 at 29.

The SEC is seeking both restitution of $2,737,507.50 of investor losses and disgorgement of the $1,950,562.98 profits of the scheme. Although the SEC can only recover up to the higher of the two amounts, $2,737,507.70, it seeks both judgments because of certain restrictions placed on the collection of restitution awards under the Federal Debt Collections Procedures Act of 1990. 28 U.S.C. § 3001 *et seq.; SEC v. Huffman*, 996 F.2d 800 (5th Cir.1993) rehg. denied 4 F.3d 992 (5th Cir.1993). The SEC is also seeking $2,381,595.69 in prejudgment interest on the amount of disgorgement and $3,121,095.23 in prejudgment interest on the amount of restitution. The SEC moves for summary judg-

ions filed on September 2, 1993, July 27, 1994, December 9, 1994, and June 16, 1995.

ment on the amount of liability for each defendant.

## II. DISCUSSION

### A. Summary Judgment Standard

The standard for granting summary judgment pursuant to Federal Rule of Civil Procedure 56 is a stringent one. Summary judgment is appropriate only if all the probative materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Hersh v. Allen Prods. Co.*, 789 F.2d 230, 232 (3d Cir.1986); *Lang v. New York Life Ins. Co.*, 721 F.2d 118, 119 (3d Cir.1983). In determining whether there remain any genuine issues of material fact, the court must resolve all reasonable doubts in favor of the nonmoving party. *Meyer v. Riegel Prods. Corp.*, 720 F.2d 303, 307 n. 2 (3d Cir.1983) *cert. dismissed*, 465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984); *Smith v. Pittsburgh Gage & Supply Co.*, 464 F.2d 870, 874 (3d Cir.1972). Significantly, "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

Under the standards announced by the Supreme Court's trilogy in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), *Anderson*, 477 U.S. 242, 106 S.Ct. at 2506–2507 (1986), and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247–48, 106 S.Ct. at 2510 (emphasis in original). "The substantive law governing the dispute will determine which facts are material, and only disputes over those facts 'that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Farid S. Khair v. Campbell Soup Co.*, 893 F.Supp. 316, 326 (D.N.J.1995) (citations omitted). Indeed, where the moving party has made a properly supported motion for summary judgment, it is incumbent upon the nonmoving party to come forward with specific facts to show that there is a genuine issue of material fact for trial. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

Thus, once the moving party has carried its burden of establishing the absence of genuine issues of material fact, the nonmoving party "may not rest upon mere allegations or denials" of its pleadings, Fed. R.Civ.P. 56(e), but must produce sufficient evidence that will reasonably support a jury verdict in its favor, *id.* at 248, 106 S.Ct. at 2510; *J.E. Mamiye & Sons, Inc. v. Fidelity Bank*, 813 F.2d 610, 618 (3d Cir.1987) (Becker, J., concurring), and not just "some metaphysical doubt as to material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356. If the moving party is the defendant, or does not bear the burden of proof on the underlying claim, the moving party may satisfy its burden by demonstrating the absence of an essential element of the opponent's case. *Id.* at 325; *see National State Bank v. Federal Reserve Bank*, 979 F.2d 1579, 1581–82 (3d Cir.1992). In such a situation, the movant has no obligation to negate the other party's case. *National State Bank*, 979 F.2d at 1582.

"[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2511. "Consequently, the court must ask whether, on the summary judgment record, reasonable jurors could find facts that demonstrated, by a preponderance of the evidence, that the nonmoving party is entitled to a verdict." *In re Paoli R.R. Yard PCB Litigation*, 916 F.2d 829, 860 (3d Cir.1990) *cert denied* 499 U.S. 961, 111 S.Ct. 1584, 113 L.Ed.2d 649 (1991).

### B. Restitution and Disgorgement

The SEC seeks awards of both restitution and disgorgement. Although the

terms are often used interchangeably, restitution and disgorgement are separate remedies. The Fifth Circuit has described the difference as follows:

> [D]isgorgement is not precisely restitution. Disgorgement wrests ill-gotten gains from the hands of a wrongdoer. It is an equitable remedy meant to prevent the wrongdoer from enriching himself by his wrongs. Disgorgement does not seek to compensate the victims of the wrongful acts, as restitution does. Thus, a disgorgement order might be for an amount more or less than that required to make the victims whole. It is not restitution.

*SEC v. Huffman*, 996 F.2d 800, 802 (5th Cir.1993) (citations omitted). The court will consider each remedy independently.

### 1. Disgorgement

Disgorgement of illegally derived funds is a remedy within the equitable powers conferred on this Court by Section 22(a) of the 1933 Act, 15 U.S.C. § 77v(a), and Section 27 of the 1934 Act, 15 U.S.C. § 78aa. *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1103 (2d Cir.1972). "The district court has broad discretion in fashioning the equitable remedy of a disgorgement order." *SEC v. Huffman*, 996 F.2d 800, 803 (5th Cir.1993). "Since disgorgement serves primarily to prevent unjust enrichment, the court may exercise its equitable power only over property causally related to the wrongdoing." *SEC v. First City Financial Corp.*, 890 F.2d 1215, 1231 (D.C.Cir.1989). "[D]isgorgement may not be used punitively," however, "the line between restitution and penalty is unfortunately blurred, and the risk of uncertainty should fall on the wrongdoer whose illegal conduct created the uncertainty." *Id.* at 1231, 1232.

 The SEC has the initial burden of establishing that "its disgorgement figure reasonably approximates the amount of unjust enrichment." *First City*, 890 F.2d at 1232. *See also SEC v. Graystone Nash, Inc.*, 820 F.Supp. 863, 875 (D.N.J.1993) rev'd on other grounds 25 F.3d 187 (3d Cir.1994); *SEC v. Hasho*, 784 F.Supp. 1059, 1111 (S.D.N.Y.1992); *SEC v. Benson*, 657 F.Supp. 1122, 1133 (S.D.N.Y.1987). In meeting its burden, the "plaintiff is not required to trace every dollar of proceeds misappropriated by the defendants ... nor is plaintiff required to identify monies which have been commingled by them." *SEC v. Great Lakes Equities Co.*, 775 F.Supp. 211, 214 n. 21 (E.D.Mich.1991) *aff'd*, 12 F.3d 214 (6th Cir.1993).

 Once the plaintiff has established that the disgorgement figure is a reasonable approximation of unlawful profits, the burden of proof shifts to the defendants, who must "demonstrate that the disgorgement figure is not a reasonable approximation." *First City*, 890 F.2d at 1232. *See also Benson*, 657 F.Supp. at 1133; *Hasho*, 784 F.Supp. at 1111. "[A]ll doubts concerning the determination of disgorgements are to be resolved against the defrauding party." *Great Lakes*, 775 F.Supp. at 214 (internal quotations omitted).

The SEC established that an illegal scheme existed, and this Court previously found each defendant liable for participation in the scheme. See Opinions filed June 16, 1995, December 9, 1994 and September 2, 1993. The SEC calculates that the participants were unjustly enriched by $1,950,-562.98. Moldowan Decl. ¶ 3. Craig Moldowan, a certified public accountant, performed the calculation by totalling the actual price received for the Hughes securities sold from the 33 nominee accounts that the defendants established in connection with the fraudulent closing of the Hughes capital offering, and adding the moneys received by Hughes itself from the initial public offering and the exercise of warrants. Moldowan Decl. ¶ 3–20.

Once the SEC met its initial burden, the burden shifted to the defendants to establish that the calculation was not a reasonable approximation of the fraud proceeds. The defendants have not contested the total calculation. Several defendants, however, have attempted to limit their individual liability by demonstrating that they received less than the total amount of the fraud profits.

Defendants Hughes Capital, Gilbert Beall, and John Knoblauch did not oppose the summary judgment motion. The remaining defendants, Frederic Mascolo, Lionel Reifler, Susan Lachance, Howard Ackerman, and Ira Victor have offered the following

evidence in their attempt to establish the recipients of the fraud proceeds: (1) Ackerman Exhibit 13, a spreadsheet tracing the Hughes funds; (2) previously filed affidavits disputing liability and reciting the conclusions in Ackerman Exhibit 13; (3) photocopies of altered check stubs; (4) Reifler's deposition testimony regarding the disposition of certain fraud proceeds; and (5) Mascolo and Victor's deposition testimony that they were paid the proceeds for legitimate purposes. Defendants have also indicated that they could present cancelled checks at trial, but did not produce them in response to the summary judgment motion.

None of the defendants' evidence is sufficient to withstand the SEC's motion for summary judgment. This Court has already ruled that categories (1) and (3) are inadmissible. Opinion filed Oct. 17, 1995. Category (2) consists of conclusory affidavits which either recite the figures in Ackerman Exhibit 13, or deny liability. This court has already determined that the defendants are liable, thus, the statements denying liability are irrelevant. The affidavits which recite figures from Ackerman Exhibit 13 are similarly irrelevant because without the inadmissible Exhibit, the affidavits are merely conclusory.

Category (4) consists of Reifler's deposition testimony that $32,000 paid by Hughes Capital into the account of Susan Lachance's company, Susan Lachance Interior Design ("SLID"), was paid out the next day in a $35,000 check to Beall. Reifler Dep. 38–39. Reifler admits that he has no personal knowledge of this transaction; his testimony is based on statements allegedly made by Ackerman. *Id.* Reifler's statement is hearsay which would not be admissible if the case proceeded to trial. Furthermore, even if Reifler's testimony were admissible, what happened to the funds after they were paid into the SLID account is irrelevant. *See, e.g., Benson,* 657 F.Supp. at 1133–34. As a participant in the fraud, Lachance is liable to disgorge the amount she received.

Category (5) consists of Mascolo and Victor's deposition testimony that Reifler paid them in connection with legitimate business activities. Mascolo and Victor have not disputed, however, that Reifler paid them with proceeds obtained from the fraud. Mascolo and Victor were participants in the fraud, and thus are liable to disgorge any proceeds of the scheme that they received. Their beliefs regarding their entitlement to the money are irrelevant to a determination of the amount of disgorgement.

In addition to attempting to create a genuine issue of material fact with these submissions, the defendants also argue that this court must conduct a hearing before awarding disgorgement. *CFTC v. American Metals Exchange Corp.,* 991 F.2d 71, 77–78 (3d Cir.1993).[2] In *CFTC,* the Third Circuit invalidated a district court disgorgement order as a remedy for violating the Commodity Exchange Act because of the way in which the district court had calculated the disgorgement amount. The district court had granted the plaintiff's motion for summary judgment and ordered the defendants to disgorge the amount lost by investors. The Court of Appeals reasoned that because the purpose of disgorgement is to prevent unjust enrichment, disgorgement of investor losses could constitute an impermissible penalty if the defendants actually received less than the amount of the losses. *Id.* at 78–79. The court noted that although in some cases the victims' losses may be used as a reasonable estimate of the wrongdoer's gains, the plaintiff had not claimed that it would be impossible to calculate the amount by which the defendants were unjustly enriched. *Id.* at 78.

Here, the amount of disgorgement, $1,950,-562.98, represents profits from the sale of the Hughes Capital securities. Moldowan Decl ¶ 3. The defendants do not dispute that this is the amount by which the group as a whole was unjustly enriched. Consequently, in this case it is appropriate for the court to order disgorgement without a hearing.

The defendants also argue that the total amount of disgorgement should be offset by certain "legitimate" business expenses. The

---

**2.** Although *CFTC* arises under the Commodity Exchange Act, the analysis is applicable to the Securities Exchange Act. *See Id.* at 78.

defendants have not, however, provided any evidence regarding business expenses. In calculating the disgorgement figure, the SEC already subtracted the $45,774.52 cost of the initial public offering. Moldowan Decl. ¶ 7. Furthermore, the overwhelming weight of authority holds that securities law violators may not offset their disgorgement liability with business expenses. *See, e.g., Great Lakes Equities Co.*, 775 F.Supp. at 214–15 & n. 22; *SEC v. World Gambling Corp.*, 555 F.Supp. 930, 935 (S.D.N.Y.1983), *aff'd*, 742 F.2d 1440 (2d Cir.1983) cert. dismissed 465 U.S. 1112, 104 S.Ct. 1620, 80 L.Ed.2d 148 (1984) at 935.

The defendants cite *SEC v. Thomas James Assoc., Inc.*, 738 F.Supp. 88 (W.D.N.Y.1990) for the proposition that business expenses should be deducted. That case is readily distinguishable, however, because in *Thomas James*, the court based its disgorgement order on "excessive" profits. In order to determine what profits were excessive, the court considered the defendants' expenses. This court is ordering disgorgement of the entire profits of the scheme. Thus, the court need not offset the amount of disgorgement by expenses.

Because the defendants have not met their burden of establishing that they received less than the total amount of the fraud proceeds, the court can order disgorgement of the entire $1,950,562.98. In determining how to apportion the disgorgement award, the court has considered uncontradicted evidence that certain defendants received certain amounts. The SEC has set forth the amount of liability that can be specifically attributed to each defendant as follows:

### a. Ackerman

■ Ackerman provided accounting and bookkeeping services for numerous entities controlled by the other defendants. He also kept Hughes' books from at least September 1986 through February 1987. The SEC contends that Ackerman received $20,000 in salary from the Lachance Group during the eight months that the fraud was active. The SEC asserts that Ackerman was not working for the Lachance Group during that time and that the Lachance Group was paying him with fraud proceeds. Ackerman argues that he was performing legitimate activities for the Lachance Group during those 8 months. The SEC has not established that the Lachance Group paid Ackerman with fraud proceeds. Consequently, because of the disputed issue of material fact, the court can not grant summary judgment holding Ackerman individually liable for the $20,000 salary payments.

The SEC also indicates that Ackerman was paid $5,644.17 by Hughes Capital for payroll and insurance. Blumenthal Ex. 13–1; Blumenthal Dep. 193–204. Ackerman has not responded to this assertion. Consequently, Ackerman is individually liable for $5,644.17.

### b. Beall

■ Beall was one of the organizers of the Hughes IPO. He also acted as an officer, director or shareholder of various entities which acquired Hughes common stock in the IPO. Both Mascolo and Reifler indicate that $250,000 of the fraud proceeds were furnished to Mascolo, an attorney. Mascolo was to use the funds to settle a dispute for Beall. Mascolo Dep. 69–79, 1256, 1542–47, 1592–94, 1624–25, 1674–75; Mascolo Ex. 164; Reifler Dep. 1086, 1178. When the dispute could not be settled, Mascolo transferred $217,300 to Beall and kept $32,700 as an attorney's fee for his work. Mascolo Dep. 69–74; Mascolo Ex. 164. Beall has asserted his Fifth Amendment privilege and, thus, has not disputed that he received these fraud proceeds. Beall Dep. 5–17. Given the uncontradicted testimony of Reifler and Mascolo, Beall is individually liable for $217,300.

### c. Mascolo

■ Mascolo was Chairman of the Board and owner of 50.3% of Insuranceshares of America, a company which announced plans to merge with Hughes. Mascolo admits that Reifler paid him $137,700. From August 1986 through May 1987, the time period in which Reifler paid Mascolo, the only business deal Reifler was involved in was Hughes Capital. Reifler Dep 951–52. Mascolo admits to receiving a $100,000 check on December 30, 1986 from an account composed of

Hughes proceeds. Mascolo Dep. 1505, 1659–60. As discussed above, Mascolo also admits that he retained $32,700 of the $250,000 that he paid to Beall. Mascolo Dep. 70, 74, 1674–75. Furthermore, Mascolo received another check for $5000 from Reifler in September 1986. Mascolo Dep. 1636–37; 1658–59. Consequently, Mascolo is individually liable for $137,700.

#### d. Knoblauch

██ Knoblauch was chairman of the board and chief operating officer of Hughes from March 1986 through June 1987. He was also an officer and director of Conserdyne Corporation, a corporation which announced plans to merge with Hughes. Hughes Capital paid Knoblauch approximately $3000 per month in salary from the fraudulent initial public offering on August 25, 1986 until Knoblauch left the company in June, 1987. Knoblauch Dep. 423–24, 439. Consequently, Knoblauch is individually liable for $24,000 of the fraud profits that he received in salary during the eight months that the fraud was operating.

#### e. Lachance

██ Reifler and Lachance, Reifler's spouse, admit that $32,000 of the fraud profits were deposited into the Susan Lachance Interior Design ("SLID") account. Lachance is the president and sole stockholder of SLID. The payment was allegedly for the purchase of furniture, but no furniture was actually sold. Reifler Dep. 42–43; Lachance Dep. 457–61. Reifler states, however, that Ackerman transferred the funds to Beall the next day. As discussed above, these statements are irrelevant. The SEC is not required to trace the ultimate recipient of the funds. Once the SEC has established that a defendant received Hughes funds without legal restriction, the defendant may be required to disgorge the funds. See, e.g. Great Lakes, 775 F.Supp. at 214; Benson, 657 F.Supp. at 1134.

In prior proceedings before Judge Lechner, Lachance submitted an affidavit of Howard Ackerman asserting that $53,232.41 of the Hughes proceeds were deposited into the SLID account. Letter Opinion of Oct. 3, 1989 (filed Oct. 4, 1989). Consequently, La-

chance is individually liable to disgorge both the $32,000 and $53,232.41, for a total of $85,232.41.

#### f. Reifler

██ Reifler was one of the organizers of the Hughes fraud and an officer, director and/or shareholder of numerous privately-held entities which acquired Hughes stock and warrants in the IPO. Reifler admits that he received $78,434 in fraud proceeds. Reifler Dep. 997–1000. Thus, he is individually liable for that amount. Reifler also submitted a letter to the SEC indicating that at most, he may have received an additional $63,218.48. Ellsworth Aff. Exh. A. Reifler contends that this letter was sent in the context of settlement negotiations and is not admissible. Given the dispute over the nature of the letter, this court will not grant summary judgment holding Reifler individually liable for the additional $63,218.48.

#### g. Victor

██ Victor was a business associate of Reifler's who recruited nominees and set up the nominee accounts through which the defendants secretly purchased securities. Victor admits that Reifler paid him a total of $8000, but argues that $5,000 was for consulting fees for work unrelated to Hughes Capital and $3000 was for travel and other expenses related to his consulting. Defendant Victor's Response to Plaintiff's Motion for Summary Judgment at 3; See Victor Dep. 199, 206–08, 349–52. From August 1986 through May 1987, the time period in which Reifler paid Victor the $8000, the only business deal he worked on was Hughes Capital. Reifler Dep 951–52. Reifler has also testified that funds were paid to Victor for his participation in the fraud. Reifler Dep. 1228–29. Consequently, Victor is individually liable for $8000.

#### h. Joint and Several Liability

Subtracting the $556,310.58 that is indisputably attributable to individual defendants from the total disgorgement figure of $1,950,-562.98 leaves $1,394,252.40 that can not be individually attributed to any defendant on summary judgment. The SEC asserts that

all of the defendants should be held jointly and severally liable for the remaining funds.

■ The court concludes that joint and several liability is appropriate for Hughes Capital, Reifler, Beall, and Knoblauch because they were knowing participants who acted closely and collectively. *See Hateley v. SEC*, 8 F.3d 653, 656 (9th Cir.1993) (joint and several liability where defendants "acted collectively" and had "a close relationship"); *Great Lakes*, 775 F.Supp. at 214 (joint and several liability where defendant is alter ego of corporate defendant and their actions were "inextricably interwoven"); *SEC v. R.J. Allen*, 386 F.Supp. 866, 881 (S.D.Fla.1974) (joint and several liability where defendants' activities were "inextricably interwoven with that of the corporation"); *World Gambling*, 555 F.Supp. at 931 ("knowing partner" jointly and severally liable where his participation in the scheme was "extensive and necessary to the scheme's success").

■ It is also appropriate to hold Lachance jointly and severally liable with Reifler because she received the benefits of her husband's violations. In *SEC v. Musella*, 818 F.Supp. 600 (S.D.N.Y.1993), the court held a defendant who had failed to comply with the court's disgorgement order in civil contempt. The court found that he had assets with which to pay the order, reasoning that it was appropriate for him to use assets in which his wife shared an interest because "he fully supports her" and funds from her business had helped finance his insider trading. *Musella*, 818 F.Supp. at 603.

As in *Musella*, Reifler pays virtually all of the household expenses. Lachance Dep. 178–79. In addition, Lachance's companies, specifically SLID and the Lachance Group, Inc., received a substantial portion of the fraud proceeds. Shine Decl. ¶ 125–26, 129, 131, 135, and 140; Letter Opinion filed October 4, 1989. Although this court has only held Lachance negligently liable for her participation in the fraud, as Reifler's wife, she received substantial benefits from the scheme. It is equitable to hold her jointly and severally liable with him to disgorge the funds. Thus, Hughes Capital, Reifler, Beall, Lachance, and Knoblauch are jointly and severally liable for $1,394,252.40.

■ The SEC contends that Victor, Ackerman, and Mascolo should also be held jointly and severally liable because they worked closely and collectively with Reifler, Beall, and Knoblauch. This court, however, has only held Victor, Ackerman, and Mascolo negligently liable for their participation in the fraud. *See* Opinions filed December 9, 1994 and June 16, 1995. Although they inadvertently assisted in the perpetration of the fraud, the SEC has not established that they were knowing participants. Consequently, the court will not grant summary judgment holding them jointly and severally liable for the remaining $1,394,252.40.

### 2. Restitution

■ In addition to disgorgement, the SEC seeks restitution. Restitution is designed to "compensate the victims of the wrongful acts." *Huffman*, 996 F.2d at 802. The defendants do not dispute that the total amount of investor losses is $2,737,507.50. Moldowan Decl. ¶ 32. That amount represents the sum of the prices paid by investors who bought the 314,500 Hughes common shares at the highest identified prices. *Id.* The investors lost the full purchase price because the shares ultimately became worthless. *Id.* at ¶ 33.

The SEC has not identified any case in which a court has awarded restitution in addition to disgorgement pursuant to its equitable powers under the securities laws. Furthermore, the investors are already pursuing redress in a class action. *See Jerry Wayne Wiley and Charles P. Moraglia v. Hughes Capital Corporation et al.*, 746 F.Supp. 1264 (1990). In the absence of any authority for making both awards, the court denies SEC's motion for summary judgment as to restitution.

### C. Prejudgment Interest

■ "Prejudgment interest on damages awarded pursuant to a violation of the federal securities laws is a matter of judicial discretion. In exercising its discretionary powers, a court must consider both compensation and fairness. An award of prejudgment interest is intended to compensate an ag-

grieved party for the wrongful deprivation of its money." *Hasho,* 784 F.Supp. at 1112 (citations omitted).

The victims of the Hughes scheme have been deprived of their funds for more than nine years while this litigation has proceeded. The SEC calculates that the amount of interest which the investors could have earned through September 31, 1995 is at least $2,381,595.69. Moldowan Decl. ¶ 21. This calculation is based on the IRS rates for underpayment of taxes. *See* 26 U.S.C. § 6621(a)(2); Moldowan Decl. ¶ 24. The SEC has previously used these rates in enforcement actions. *See, e.g., SEC v. Drexel Burnham Lambert Inc.,* 837 F.Supp. 587, 612 n. 8 (S.D.N.Y.1993). The defendants have not contested the SEC's calculation.

It comports with the fundamental notions of fairness to award prejudgment interest. The defendants had the benefit of nearly $2 million dollars for the nine and one-half years between the fraud and today's disgorgement order. In order to deprive the defendants of their unjust enrichment, the court orders the defendants to disgorge $2,381,595.69 in prejudgment interest.

## III. *CONCLUSION*

Based upon the foregoing, plaintiff's motion for summary judgment as to the liability of each defendant is GRANTED as to disgorgement but DENIED as to restitution.