SECURITIES AND EXCHANGE COMMISSION, Plaintiff–Appellee,

v.

FIRST PACIFIC BANCORP; PacVen, Inc., Defendants–Appellants,

Leonard S. Sands; Charles W. Knapp; Berrien Moore; Daniel S. Geiger; Mulk Raj Dass; Apex Investment Securities, Ltd., Defendants,

SECURITIES AND EXCHANGE COMMISSION, Plaintiff–Appellee,

v.

Leonard S. SANDS, Defendant–Appellant,

First Pacific Bancorp; PacVen, Inc.; Charles W. Knapp; Berrien Moore; Daniel S. Geiger; Mulk Raj Dass; Apex Investment Securities, Ltd., Defendants.

Nos. 96–56687, 96–56690.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 7, 1998.

Decided April 28, 1998.

Scott W. Wellman, Wellman & Warren LLP, Irvine, California, for defendants-appellants.

Mark Pennington, Sr. Litigation Counsel, S.E.C., Washington, DC, for plaintiffs-appellees.

Before: FARRIS, O'SCANNLAIN, and FERNANDEZ, Circuit Judges.

FERNANDEZ, Circuit Judge:

The Securities and Exchange Commission brought a civil enforcement action against Leonard S. Sands, First Pacific Bancorp (Bancorp), and PacVen Inc. for violations of the antifraud, filing and disclosure provisions of the federal securities laws. The district court granted partial summary judgment in favor of the SEC on three of its claims.[1] After a bench trial, the court ruled in favor of the SEC on all of its remaining claims. Sands, Bancorp and PacVen appeal the dis-

---

1. *See SEC v. Sands,* 902 F.Supp. 1149 (C.D.Cal. 1995) (*Sands I*).

trict court's grant of partial summary judgment. They also appeal the court's final judgment, which permanently enjoins them from future violations of the securities laws, orders them to disgorge $688,000 plus prejudgment interest, and permanently bars Sands from acting as an officer or director of a public company. We affirm.

## BACKGROUND

Sands was the chairman of the board, chief executive officer and corporate counsel of Bancorp, a Delaware corporation organized as a bank holding company, and owned 54% of its common stock. Sands was also the chairman of the board and corporate counsel of First Pacific Bank, Inc. (Bank), the wholly owned subsidiary of Bancorp and its major asset. In addition, Sands was the president and the CEO of PacVen, a Nevada "blank check", also known as "shell", corporation formed for the purpose of merging with or acquiring other companies.

Beginning in the early 1980s, state and federal regulators repeatedly rated the Bank "unsatisfactory" because of its inadequate capital, earnings and liquidity, and because of its increasing amounts of classified assets and past due loans. In the late 1980s, Bancorp and Sands engaged in several financial transactions designed to raise additional capital for the failing Bank. They committed various securities law violations in the process.[2]

The transaction which underlies most of the issues in this appeal was the Bancorp's 1987 public offering of securities. In April of 1987, it commenced a "mini-max" public offering with the intention of downstreaming its proceeds to the financially troubled Bank. Under the terms of the offering, Bancorp was required to sell a minimum of 750 "units," at $2,000 each, on an all-or-nothing basis by August 12, 1987. The underwriter later extended the deadline to October 10, 1987. If all 750 units were not sold by the deadline, the offering was to be cancelled and the funds were to be returned to the investors. If the minimum were reached, Bancorp had a right to sell up to 1,275 units on a best-efforts basis.

On October 9, 1987, $1,688,000 was forwarded to the escrow agent for investment in the Bancorp offering, but of those funds, $1,000,000 was in the form of a check written by Paul Kutik, chairman of Savoy Reinsurance Company, and drawn on the Bank of Montreal, Bahamas Ltd. That check was later returned unpaid. Also, $500,000 had been raised in a public offering by PacVen in July of 1987, and was fraudulently diverted by Sands into the Bancorp offering.[3] Thus, Bancorp only succeeded in raising $688,000 by the deadline, and only $188,000 of the funds came from bona fide investors. However, Sands and Bancorp did not return the funds to the investors as they had promised in the Prospectus, but instead continued with the offering. On December 30, 1987, the date the offering was scheduled to close, Sands purchased 500 of the Bancorp units, paying $1,000,000 of his own funds. That purchase brought the total amount to $1,688,-000. The offering was then closed and the proceeds were delivered to the Bank.

Among other things, the SEC sought to have Sands, Bancorp and PacVen disgorge the $688,000 raised in the Bancorp offering from outside investors, and to have Sands barred from serving as an officer or director of publicly held companies in the future. The district court granted both forms of relief and this appeal ensued.[4]

---

**2.** Those efforts were ultimately unsuccessful and the Bank was closed by state regulators on August 10, 1990. *See First Pacific Bank v. Gilleran,* 40 F.3d 1023, 1024 (9th Cir.1994).

**3.** PacVen funds were to be used for the purpose of acquiring or merging with another company. While awaiting an opportunity, they were to be held in interest bearing accounts in commercial financial institutions, and its investors were told that there was no intention to enter into a transaction with a business with which an officer or director was affiliated. Nevertheless, within a few short months, Sands had diverted the PacVen money through companies owned by his former associate, Charles Knapp, and into the risky Bancorp offering. The funds were never returned to the PacVen investors.

**4.** Aside from their other claims, Sands, Bancorp and PacVen all assert that the district court's findings of fact are not supported by the evidence because the findings refer to some pieces of evidence that were either inadmissible or that

## JURISDICTION AND STANDARDS OF REVIEW

The district court had jurisdiction pursuant to 28 U.S.C. § 1331. We have jurisdiction pursuant to 28 U.S.C. § 1292(a)(1).

We review the grant of summary judgment de novo. *See Goldblatt v. FDIC,* 105 F.3d 1325, 1327 (9th Cir.1997). We review the district court's order of disgorgement for abuse of discretion. *See SEC v. Clark,* 915 F.2d 439, 453 (9th Cir.1990). Similarly, we review the district court's decision to bar Sands from serving as an officer or director of a publicly held company for abuse of discretion. *See SEC v. Posner,* 16 F.3d 520, 522 (2d Cir.1994).

## DISCUSSION

### A. *DISGORGEMENT*

Sands and Bancorp object to the district court's grant of summary judgment against them on the SEC's claim that their handling of the Bancorp offering constituted securities fraud. *See Sands I,* 902 F.Supp. at 1162–63. Sands also claims that even if the summary judgment were proper, he should not have been ordered to disgorge $688,000. For convenience, we will only refer to Sands in the ensuing discussion, though, of course, if he were correct about the summary judgment grant, that would inure to Bancorp's benefit also.

#### (1) *The summary judgment*

■ We recognize that in reviewing the district court's grant of summary judgment in favor of the SEC, we must view the evidence in the light most favorable to Sands, and determine "whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Goldblatt,* 105 F.3d at 1327. That does not help Sands at all.

Sands cannot dispute that the $1,000,000 check written by Paul Kutik and drawn on the Bank of Montreal, Bahamas Ltd. was returned unpaid. Rather, he contends that the minimum requirement of the offering was satisfied because a sufficient amount was received in the form of checks by the deadline. We reject that argument. Rule 10b–9 expressly provides that funds invested in the mini-max offering must be promptly refunded to the investors unless "(i) a specified number of units of the security are sold at a specified price within a specified time, and (ii) *the total amount due to the seller is received by him* by a specified date." 17 C.F.R. § 240.10b–9 (a)(2) (emphasis added).[5] Thus, Bancorp had to receive "the total amount due" to it, i.e. $1,500,000, by the October 10 deadline. A check is merely a "promise to pay." *See* Black's Law Dictionary 237 (6th ed.1990). As this case vividly demonstrates, the receipt of a "promise to pay" $1,000,000 is not equivalent to the receipt of the actual "amount due" because the check may fail to clear. Had the check cleared in the regular course of business but after the deadline, it could be argued that the result should be different, but we need not decide *that* issue. On the facts of this case, Bancorp did not raise the $1,500,000 amount by the October 10 deadline as was required by the terms of the offering.

■ Sands attempts to put his own spin on the actual course of events by arguing that he acquired Paul Kutik's position in the offering and Kutik invested before the deadline. His attempt fails. Because Kutik's check never cleared, his "position" in the offering amounted to zero. Sands' purchase of the 500 units, which Kutik had merely *wished to* purchase, occurred after the deadline and, therefore, after the Bancorp offer-

were never admitted at trial. We have carefully reviewed the findings of fact that refer to the inadmissible or unadmitted evidence, and have determined that none of the material was critical to the district court's findings of liability or the equitable remedies granted by the court. As the findings of fact were very detailed and lengthy (641 findings, 171 pages), the elimination of a few findings had no substantial effect. The find-

ings of fact were adequately supported by admissible and admitted evidence.

5. The SEC has also expressly indicated that where, as here, an offering is contingent upon a specified amount of units being sold, that contingency is not satisfied unless all the securities "are fully paid for." Exchange Act Release No. 11,532, 7 SEC Docket 403, 403 (July 11, 1975).

ing had already failed for inability to raise the $1,500,000 minimum.

Sands' main contention, however, is that he had "bona fide" intentions at the time of his investment in the offering, and he did not, therefore, act with the requisite scienter. This argument goes very wide of the mark. The fact that Sands made a real investment is not determinative because that investment occurred after the Bancorp offering had already failed to satisfy the minimum requirement. If he wanted to invest, fine. But the other investors' funds should have been returned to them.

In a mini-max offering, scienter is shown by a defendant's knowledge of the minimum requirement, and that the funds were retained even though the minimum amount was not raised. As the court said in *C.E. Carlson, Inc. v. SEC*, 859 F.2d 1429 (10th Cir.1988):

> The SEC thus determined that both petitioners acted with scienter.... Scienter "refers to a mental state embracing intent to deceive, manipulate, or defraud." Proof of scienter may be satisfied by a showing of recklessness, or conduct which falls far short of the standard of ordinary care and which carries a danger of misleading purchasers such that petitioners knew or must have known of its propensity to mislead. The SEC found that petitioners were aware of the part-or-none provision, the requirement that two million shares be sold in a manner not inconsistent with a public distribution. Rather [than] wait for additional public sales or return the funds of subscribers, petitioners arranged for non-public sales to close the offering and then retained the funds.

*Id.* at 1435–36 (internal citations omitted); *see also Svalberg v. SEC*, 876 F.2d 181, 184 (D.C.Cir.1989) (scienter is shown by "knowledge of what one is doing and the consequences of those actions"). When the $1,000,000 check from Paul Kutik was returned unpaid, Sands knew that Bancorp had failed to raise $1,500,000 as was required by the terms of the offering. But instead of refunding $688,000 to the investors, Sands retained those funds and proceeded to close

the offering by investing $1,000,000 of his own money. That itself was fraudulent.

As the court pointed out in *Svalberg*, 876 F.2d at 183:

> The all-or-nothing provision serves not only to ensure that the issuing firm has sufficient funds to complete its project, but also to give investors some reasonable indication that they are paying a fair market price for their investments. Closing an all-or-none offering before the required minimum number of shares has been sold *to the public* is therefore fraudulent.

*See also Banc One Capital Partners Corp. v. Kneipper*, 67 F.3d 1187, 1193 (5th Cir.1995) ("The sellers cannot avoid the requirements of [an all-or-none] provision by fraudulently creating the impression that the minimum has been met."); *C.E. Carlson, Inc.*, 859 F.2d at 1434; *A.J. White & Co. v. SEC*, 556 F.2d 619, 622–23 (1st Cir.1977). Thus, regardless of his long term intentions at the time of the investment, the knowing retention of the monies that others invested into Bancorp's failed offering satisfied the scienter requirement, and the district court did not err in granting summary judgment on that issue.

(2) *The disgorgement order against Sands*

The district court has broad equity powers to order the disgorgement of "illgotten gains" obtained through the violation of the securities laws. *See Clark*, 915 F.2d at 453; *see also SEC v. Fischbach Corp.*, 133 F.3d 170, 175 (2d Cir.1997); *SEC v. First Jersey Sec. Inc.*, 101 F.3d 1450, 1474 (2d Cir.1996), *cert. denied*, —— U.S. ——, 118 S.Ct. 57, 139 L.Ed.2d 21 (1997). Disgorgement is designed to deprive a wrongdoer of unjust enrichment, and to deter others from violating securities laws by making violations unprofitable. *See Hateley v. SEC*, 8 F.3d 653, 655 (9th Cir.1993); *SEC v. Rind*, 991 F.2d 1486, 1491 (9th Cir.1993). Further, where two or more individuals or entities collaborate or have a close relationship in engaging in the violations of the securities laws, they have been held jointly and severally liable for the disgorgement of illegally obtained proceeds. *See Hateley*, 8 F.3d at 656; *see also SEC v. Hughes Capital Corp.*, 124 F.3d 449, 455 (3d Cir.1997); *First Jersey*,

101 F.3d at 1475. Sands played the principal role in the fraudulent activities in connection with the Bancorp offering. He fraudulently diverted $500,000 from PacVen and later invested his own funds in order to close an offering that had already failed to meet the minimum requirement. As the chairman of the board, the CEO and the majority shareholder of Bancorp, and as the president and the CEO of PacVen, Sands clearly enjoyed a "close relationship" with those corporate codefendants. *See Hughes,* 124 F.3d at 455. It was appropriate to hold Sands and his corporate codefendants jointly and severally liable for their jointly undertaken violations of the securities laws.

▮▮▮▮▮ Sands argues that he should not have been ordered to disgorge the proceeds of the offering because he received no personal financial benefit as a result of that offering. We reject the argument. The infusion of capital from the Bancorp offering put off a bank failure and enabled the Bank to remain in operation for two and a half more years. During that time, Sands engaged in what the district court's findings characterized as "milking the asset," by paying himself hundreds of thousands of dollars in salaries, commissions, and consulting, management and legal fees. The California state bank examiners determined that although Sands was not then an officer of the Bank, he retained control over the Bank and continued to extract sufficient income to service his heavy personal debt and to cover his living expenses. The FDIC inspector found that Sands was paying himself excessive compensation, which amounted to two or three times what a CEO of a comparable, well-managed institution would receive. The FDIC inspector also noted in his report that Sands "apparently could not afford to reduce his salary, pay on his loans, and maintain his

standard of living." Thus, Sands received substantial personal benefit from the infusion of the illegally obtained proceeds from the Bancorp offering into the failing Bank, which justified the district court's order directing Sands to disgorge those proceeds.[6]

▮▮▮▮▮ Sands also claims that the district court ordered restitution instead of disgorgement, and that he was unfairly surprised and had no opportunity to raise defenses to that form of remedy. Sands' claim of unfair surprise is not supported by the record. Several pretrial pleadings filed by the SEC specifically requested that the court order Sands to disgorge the fraudulently retained proceeds of the Bancorp offering, and that those proceeds be returned to the investors as restitution. Further, it is quite clear from the district court's conclusions of law that the remedy it granted was disgorgement rather than restitution. The fact that the district court directed that the disgorged funds be returned to the defrauded investors does not change the nature of the remedy. Once the primary purpose of disgorgement has been served by depriving the wrongdoer of ill-gotten gains, the district court has broad discretion in determining the disposition of the disgorged funds. *See Fischbach,* 133 F.3d at 175 ("Once the profits have been disgorged, it remains within the court's discretion to determine how and to whom the money will be distributed...."); *SEC v. Huffman,* 996 F.2d 800, 803 (5th Cir.1993) ("The district court has broad discretion in fashioning the equitable remedy of a disgorgement order."); *see also SEC v. Drexel Burnham Lambert, Inc.,* 956 F.Supp. 503, 507 (S.D.N.Y.), *aff'd,* 133 F.3d 170 (1997).

We need not engage in a rather scholastic argument about whether restitution and disgorgement are really just about the same

---

**6.** The district court was not required to trace every dollar of the offering proceeds fraudulently retained by Sands. *See SEC v. Hughes Capital Corp.,* 917 F.Supp. 1080, 1085 (D.N.J.1996), *aff'd* 124 F.3d 449 (3rd Cir.1997). The amount he was ordered to disgorge had to be only "a reasonable approximation of profits causally connected to the violation." *First Jersey,* 101 F.3d at 1475 (citation omitted). Nor does the fact that Sands' scheme ultimately failed and he lost a $1,000,000 of his own funds release him from his

obligations toward the defrauded investors. As Judge Friendly once stated in a securities manipulation case, there is "no reason why, in determining how much should be disgorged in a case where defendants have manipulated securities so as to mulct the public, the court must give them credit for the fact that they had not succeeded in unloading all their purchases at the time when the scheme collapsed." *SEC v. Commonwealth Chem. Sec. Inc.,* 574 F.2d 90, 102 (2d Cir.1978).

thing. *Compare Tull v. United States,* 481 U.S. 412, 424, 107 S.Ct. 1831, 1839, 95 L.Ed.2d 365 (1987) (they are to be equated), *and SEC v. Blatt,* 583 F.2d 1325, 1335 (5th Cir.1978) (same), *with Texas American Oil Corp. v. United States Dep't of Energy,* 44 F.3d 1557, 1569–70 (Fed.Cir.1995) (they are distinct concepts), *and Huffman,* 996 F.2d at 802 (same). The distinction drawn between the two remedies plays no role in this case because the district court determined that Sands and Bancorp were unjustly enriched by the amount that they fraudulently retained from the Bancorp offering and fraudulently diverted from the PacVen offering. The fact that the district court also ordered restitution does not affect the nature of the disgorgement remedy; nor does it render the disgorgement order improper. *See Fischbach,* 133 F.3d at 176 ("[I]t is normally within the district court's discretion to order that disgorged funds be used to compensate securities fraud victims....."); *SEC v. World Gambling Corp.,* 555 F.Supp. 930, 934 (S.D.N.Y.), *aff'd,* 742 F.2d 1440 (2d Cir.1983) ("[W]hile disgorgement has been said to serve more important interests that the compensation of investors, that principle is a far cry from the proposition that restitution is an improper end." (internal citation omitted.))

### B. *OFFICER AND DIRECTOR BAR*

■ Sands earnestly argues that he should not have been "permanently and unconditionally prohibited from acting as an officer or director of any issuer required to file reports pursuant to Sections 12(b), 12(g) or 15(d) of the Securities Exchange Act of 1934 [15 U.S.C. §§ 78l(b), (g) or 78o(d) ]." We have listened carefully to his monody, but we agree with the district court that protection of the public justifies the bar. In addition to the conduct we have detailed in the Background portion of this Opinion, Sands

helped to orchestrate transactions involving Residual Interest Wrap Notes and Liberian Certificates of Deposit, which greatly and artificially inflated the value of the Bank.[7]

■ The district court has broad equitable powers to fashion appropriate relief for violations of the federal securities laws, which include the power to order an officer and director bar. *See Posner,* 16 F.3d at 521; *see also SEC v. Patel,* 61 F.3d 137, 141 (2d Cir.1995) (a district court has "substantial discretion" in deciding whether to impose an officer and director bar). In addition to the court's inherent equitable powers, the Securities Enforcement Remedies and Penny Stock Reform Act of 1990 (Remedies Act) authorizes the court to order an officer and director bar "if the person's conduct demonstrates substantial unfitness to serve as an officer or director." 15 U.S.C. § 78u(d)(2).[8] In determining whether to order the bar, a court may consider: "(1) the 'egregiousness' of the underlying securities law violation; (2) the defendant's 'repeat offender' status; (3) the defendant's 'role' or position when he engaged in the fraud; (4) the defendant's degree of scienter; (5) the defendant's economic stake in the violation; and (6) the likelihood that misconduct will recur." *Patel,* 61 F.3d at 141.

The district court considered those factors, and found that Sands' "securities violations are egregious; he caused the collapse of a federally insured bank; he attempted to stymie banking regulators from doing their jobs; he is a recidivist; and the fraudulent conduct he committed occurred while serving in a corporate or fiduciary capacity." The district court also found that Sands had a high level of scienter, that he engaged in ongoing and recurrent violations, that he had failed to assume any responsibility for his violations of law, that he utterly failed to

---

7. These transactions are described in *Sands I,* 902 F.Supp. at 1155–56, 1161–62. In *Sands I* the district court reserved judgment regarding issues of Sands' intent and wrongdoing. It later resolved those issues against him.

8. We reject Sands' argument that the Remedies Act does not apply retroactively to conduct that occurred prior to its enactment. The Act merely codified the equitable authority to impose officer

and director bar which the courts already possessed and exercised. *See SEC v. Drexel Burnham Lambert Inc.,* 837 F.Supp. 587, 613 (S.D.N.Y.1993), *aff'd,* 16 F.3d 520 (2d Cir.1994). Furthermore, the district court in this case relied on the alternative basis for the injunction—its equitable powers to fashion appropriate relief for violations of the federal securities laws. *See Posner,* 16 F.3d at 521.

recognize the wrongful nature of his conduct, and that there was a strong likelihood of future violations. We see no error in those detailed findings. Indeed, they describe Sands' actions perfectly and are sufficient to support the court's discretionary decision to protect the public interest by barring Sands from serving as an officer or director of a public company. We think we need only briefly comment on his audacious argument that the officer and director bar is against the public interest because it will interfere with his active involvement in charitable activities. Perhaps he is right that charities will not want to place him in positions of high visibility and prestige. If so, and if Sands does have a genuine interest in doing charitable works, we are certain that he can continue his charitable involvement in a less prestigious, but just as worthy, capacity. We touch on this argument because it underscores the purblindness of Sands and the perspicacity of the district court.

## CONCLUSION

Sands, a sophisticated businessman and a lawyer, has engaged in numerous activities in violation of the securities laws and basic notions of right and wrong. He perpetuated a number of frauds upon investors and regulators. We need not sort out whether his principles are just plain wrong, or whether he is afflicted with akrasia, or whether there is some other explanation for his actions. What is clear is that he, along with Bancorp and PacVen, must disgorge the amounts that the unwitting investors were relieved of. Equally clear, the district court properly barred him from assuming a position from which he could inflict similar wrongs in the future.

**AFFIRMED.**